**MONSANTO COMPANY, Plaintiff,**

v.

**MYCOGEN PLANT SCIENCE, INC., Agrigenetics, Inc., and Novartis Corporation, Defendants.**

**No. Civ.A. 96–133–RRM.**

United States District Court, D. Delaware.

Aug. 18, 1999.

---

Richard L. Horwitz, and Joanne Ceballos, Potter Anderson & Corroon, Wilmington, Delaware; John F. Lynch, Craig M. Lundell, Melinda L. Patterson, and Susan K. Knoll, Arnold, White & Durkee, Houston, Texas, for plaintiff Monsanto Company.

Josy W. Ingersoll, and Richard H. Morse, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, Daniel J. Thomasch, Richard W. Mark, Craig R. Kaufman, Ryan D. Poliakoff, Orrick, Herrington & Sutclifffe LLP, New York City, Douglas E. Olson, F.T. Alexandra Mahaney, and Jeffrey W. Guise, Lyon & Lyon, La Jolla, California, Gerald Sobel, and Joel Katcoff, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, for defendants Mycogen Plant Science, Inc. and Agrigenetics, Inc.

Paul M. Lukoff, Prickett, Jones, Elliott & Kristol, Wilmington, Delaware, Dimitrios T. Drivas, John S. Willems, Jeffrey Oelke, and Leslie Morioka, White & Case LLP, New York City, for defendant Novartis Corporation.

## OPINION

McKELVIE, District Judge.

This is a patent case. Plaintiff Monsanto Company owns U.S. Patent No. 5,500,365 ("the '365 patent") which is directed to a modified bacterial gene inserted into plants to make plants insect-resistant. The inventors are David A. Fischhoff and Frederick J. Perlak. In a complaint filed in March 1996, Monsanto contends Mycogen Plant Science, Inc., Agrigenetics, Inc. and Novartis Corporation infringe the '365 patent. Defendants have answered by denying they infringe the '365 patent and asserting certain affirmative defenses. Defendants also counterclaim for declaratory judgment of non-infringement, invalidity and unenforceability of the '365 patent.

In June 1998, a jury returned a verdict finding that the defendants' products literally infringe the '365 patent, but that the defendants' products are so far changed from the principle of the invention claimed in the '365 patent that they do not infringe by application of the reverse doctrine of equivalents. The jury also found that the

asserted claims are invalid by prior invention because others invented the claimed subject matter before Monsanto did. The court held a bench trial on defendants' counterclaim that the '365 patent is unenforceable because of Monsanto's alleged inequitable conduct before the Patent and Trademark Office ("PTO") in prosecuting the application leading to the '365 patent.

The parties have moved for judgment as a matter of law, and Monsanto and Mycogen have moved for a new trial. The following is the court's decision on these motions and defendants' inequitable conduct claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Status of the Case*

The court draws the following facts from the evidence presented at the hearing construing the '365 patent's claims and at the jury and bench trials.

Plaintiff Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri. Monsanto owns the '365 patent which is directed to a modified bacterial gene inserted into plants to make plants insect-resistant.

Defendant Mycogen Plant Science, Inc. is a Delaware corporation with its principal place of business in San Diego, California. Defendant Agrigenetics, Inc. is a Delaware corporation with its principal place of business in San Diego, California. Agrigenetics is a wholly-owned subsidiary of Mycogen. For convenience, the court refers to Mycogen Plant Science, Inc. and Agrigenetics, Inc. collectively as "Mycogen."

Defendant Novartis Corporation is a New York corporation with its principal place of business in Summit, New Jersey. Novartis is the product of a merger between Ciba–Geigy Ltd. and Sandoz Ltd. This merger occurred during the course of this litigation. Monsanto originally named Ciba–Geigy Corporation (Seed Division) ("Ciba Seeds") as a defendant. Ciba Seeds was an unincorporated division of Ciba–Geigy Corporation, ("Ciba–Geigy") a New York corporation with its principal place of business in Tarrytown, New York. Ciba Seeds had its principal place of business in Research Triangle Park, North Carolina. After the merger took place, the court ordered the case caption changed to reflect that Ciba–Geigy is now known as Novartis. *See Monsanto v. Mycogen,* D.Del.C.A. No. 96–133–RRM, order, McKelvie, J. (June 16, 1998) (D.I.474). The court uses the name Novartis in this opinion for the defendant previously known as Ciba–Geigy.

On March 19, 1996, Monsanto filed a complaint contending that defendants infringe and induce others to infringe the '365 patent.

Mycogen and Novartis answered denying the allegations. Mycogen and Novartis asserted the affirmative defense that the '365 patent is invalid due to prior invention, lack of enablement, lack of written description, indefiniteness and obviousness. Mycogen also asserted the affirmative defense that Mycogen is entitled to a license to practice the teachings of the '365 patent pursuant to a licensing agreement between Monsanto and Mycogen's predecessor corporation.

Mycogen and Novartis counterclaimed that they have not directly or contributorily infringed the '365 patent, and that the '365 patent's claims are invalid for the same reasons stated in their affirmative defenses. In addition, Mycogen counterclaimed that the '365 patent is unenforceable due to Monsanto's alleged inequitable conduct before the PTO in prosecuting the application leading to the '365 patent.

Mycogen also counterclaimed that Monsanto misappropriated Mycogen's trade secrets, breached a confidentiality and non-use agreement between Monsanto and Mycogen's predecessor, and breached an implied covenant of good faith and fair dealing owed to Mycogen. These last counterclaims arise from Monsanto's inspection of a patent application owned by

Mycogen's predecessor pursuant to Monsanto's executing a confidential disclosure and non-use agreement. Mycogen's predecessor owned this patent application. Mycogen alleges that Monsanto misused proprietary information contained in this application in developing the technology embodied in the '365 patent. The application at issue has since matured into United States Patent No. 5,380,831 ("the '831 patent"). Like the '365 patent, the '831 patent is directed to a modified bacterial gene inserted into plants to make plants insect-resistant. At the time of trial, Mycogen owned the '831 patent and Agrigenetics had the right to produce its commercial embodiment.

On February 24, 1997, Monsanto moved for summary judgment on Mycogen's counterclaims of trade secrets misappropriation, breach of contract, and breach of an implied covenant of good faith and fair dealing, and on Mycogen's affirmative defense of license. On December 22, 1997, the court granted Monsanto's summary judgment motion, finding the counterclaims are barred by the statute of limitations, and that Monsanto did not grant Mycogen a license to practice the teachings of the '365 patent. The court entered an order finding in favor of Monsanto and against Mycogen on these counterclaims and affirmative defense. *See Monsanto v. Mycogen,* D.Del.C.A. No. 96–133–RRM, order, McKelvie, J. (December 22, 1997) (D.I.292).

On May 20, 1998, the court held the part of the trial necessary to construe disputed claim language of the '365 patent, in accordance with *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). At the conclusion of the claim construction hearing, the court construed the patent claim language at issue. In this opinion, the court explains its claim construction decision in greater detail.

From June 15, 1998 to June 30, 1998, the court held a ten-day jury trial on the issues of infringement and validity. On June 30, 1998, the jury returned its verdict. The jury found that defendants' products literally infringe the four asserted claims (Claims 7, 8, 9 and 12) of the '365 patent. Although the jury found the defendants' products literally infringe the asserted claims, the jury also found that defendants' products are so far changed from the principle of the invention claimed in the '365 patent that they do not infringe the asserted claims by application of the reverse doctrine of equivalents. The jury also found that the four asserted claims of the '365 patent are invalid because scientists at Agracetus, Inc. invented the claimed subject matter before Monsanto's inventors did.

On June 29 and July 8, 1998, the court held a bench trial on whether the '365 patent is unenforceable because of Monsanto's alleged inequitable conduct before the PTO in prosecuting the application leading to the '365 patent.

As follows, the court decides all pending trial issues and post-trial motions. To better explain the court's decision on these issues and motions, the court first provides the reader with background on two scientific topics central to this case: (1) *Bacillus thuringiensis,* a naturally-occurring bacterium, and (2) genetic engineering.

B. *Background Information on Bacillus Thuringiensis*

*Bacillus thuringiensis* ("*Bt*") is a naturally-occurring bacterium found in soil. *Bt* possesses an unusual property: it produces a protein that kills certain crop-destroying insects. This protein is known variously as "pesticidal protein toxin," "pesticidal protein," "toxic crystal protein" or "toxin protein." When eaten by certain insects, the protein dissolves the insects' stomach linings, causing the insects to die. While the *Bt* protein is a natural pesticide, it is not harmful to humans, animals or beneficial insects like bees and ladybugs.

The *Bt* protein is particularly deadly for insects like the European corn borer.

This worm-like insect feeds on corn plants, eating its way into stalks and ears. The European corn borer can kill a plant outright or dramatically reduce the size and number of kernels that grow on an ear. According to some estimates, this pest costs American farmers as much as $1 billion per year in lost crops.

For years, farmers have been spraying their crops with pesticides containing the *Bt* protein as well as other chemicals. Spraying, however, is not always effective because some insects, including the European corn borer, tunnel into plants soon after they hatch, or stay on the underside of leaves, where the spray does not reach them. In addition to its ineffectiveness, spraying adds to farmers' costs and the spraying of some pesticides raises environmental and health concerns.

Scientists have long considered the idea of introducing genes from different organisms into crops and livestock. Developments in genetic engineering focused the scientific community's attention on whether plants could somehow be genetically-modified to resist attack by insect pests. Advances in genetic engineering and plant molecular biology have made it possible to create plants which produce *Bt* toxin proteins. Thus, these genetically-modified plants have their own built-in protection from insects. Issues related to advances in genetic engineering and plant molecular biology are at the heart of this case.

Initially, scientists experimented with inserting the native *Bt* gene for *Bt* pesticidal protein into plant cells. The native *Bt* gene refers to the naturally-occurring gene as it is found in the bacterium. While native *Bt* genes can be introduced into plant cells, the new genetically-modified plants do not produce enough *Bt* pesticidal protein to kill insects. In scientific terms, the level of expression of the native *Bt* genes inserted into the plants is too low to be effective.

To solve the problem of low expression, scientists devised ways to increase the level of *Bt* expression in plants. They eventually succeeded by modifying the native *Bt* gene, as detailed below. Scientific success led to commercial success. For example, the U.S. Environmental Protection Agency gave its first approval to a genetically-engineered plant to biologically control insects on May 5, 1995, when it approved a genetically-modified potato. By 1996, the EPA approved insect-resistant corn, or *Bt* corn, for commercial use. In 1996, U.S. farmers planted almost no genetically-modified crops; by 1999, genetically-modified corn accounted for at least one-fourth of the corn grown by U.S. farmers. *See* Carol Kaesuk Yoon, "Pollen From Genetically Altered Corn Threatens Monarch Butterfly, Study Finds," *New York Times*, May 20, 1999 (estimating that in 1999, *Bt* corn will be cultivated on an estimated 10 million to 20 million acres out of an 80 million acre corn crop nationwide); "Doubling of Land Area Growing Genetically Modified Crops," *Agence France-Presse*, Feb. 26, 1998, (estimating that in 1998, genetically-modified corn will be cultivated on eight million hectares [19.75 million acres], chiefly in the United States). *See also* "Food for Thought," *Economist*, Jun. 19, 1999, (estimating that genetically-modified crops account for as much as 55% of U.S. soybean, 50% of U.S. cotton and 40% of U.S. corn production.)

The patents at issue involve a method to increase *Bt* expression in genetically-modified plants. To help the reader understand this method and the issues underlying this case, the court provides the following background information on genetic engineering.

### C. *Background Information on Genetic Engineering*

Organisms, like plants and animals, are made up of cells. Genes are units of DNA (deoxyribonucleic acid) which encode the necessary information for cells to reproduce and to produce specific proteins.

Genes are comprised of DNA, an acronym for deoxyribonucleic acid. DNA con-

sists of two long chains or strands that wrap around each other in a shape known as a double-stranded spiral helix. Visually, a molecule of DNA resembles a twisted ladder. The sides of the ladder are connected by rungs made up of pairs of molecules called nucleotides or bases. Four nucleotides, adenine ("A"), guanine ("G"), cytosine ("C") and thymine ("T"), form the particular DNA make-up of genes. A particular DNA molecule can be graphically represented by listing the nucleotide sequences making up that DNA molecule.

Because of the nucleotides' chemical make-up, A will only pair with T, and C will only pair with G. This strict complementary pairing means that the order of the nucleotides on one side of a DNA rung determines the order on the other side of the rung. Therefore, each rung of the ladder is composed of one pair consisting of A and T, or C and G. Each rung is called a nucleotide pair, and the order in which these nucleotide pairs appear on the DNA ladder constitutes the genetic code for the cell.

DNA directs cells to make proteins through a two-step process of transcription and translation. In the first step, transcription, information is transferred from DNA to an RNA, or ribonucleic acid, molecule. RNA that codes for a protein is called messenger RNA ("mRNA"). RNA is a long single strand of linked nucleotides similar to DNA, except RNA contains the nucleotide Uracil ("U") in place of Thymine. In transcription, specific nucleotide sequences on the DNA determine where the RNA copy begins and ends.

In the second step, translation, the nucleotide sequence of the mRNA is translated into the amino acid sequence of the corresponding protein. For translation, a complex structure known as a ribosome reads the mRNA nucleotide sequence and translates it into amino acids. These amino acids are then assembled into proteins. In this way, ribosomes carry out protein synthesis.

Ribosomes read a nucleotide sequence in sets of three nucleotides, known as codons. Each codon directs the ribosome to select a certain amino acid. For example, GCT is a codon directing the ribosome to select the amino acid, alanine. Just as nucleotides are the basic units of DNA, amino acids are the basic units of proteins. A protein can contain few or many amino acids. For example, some *Bt* pesticidal proteins contain more than 600 amino acids. Thus, a given series of codons specifies a sequence of amino acids comprising a particular protein.

While there are 61 possible codons, there are only 20 amino acids.[1] Most amino acids can be specified by more than one codon. In other words, one codon can be substituted for another in the gene without changing the amino acid and resulting protein. For instance, the amino acid, alanine, is specified by four different codons: GCT, GCG, GCC and GCA. Two very different series of codons could produce the exact same series of amino acids. In fact, most amino acids are specified or coded by more than one codon.[2]

Scientists use special tables known as codon usage tables to determine the frequency with which certain codons appear

1. There are 61 codons because a codon is a sequence of three nucleotides. For mRNA, there are four nucleotide possibilities, A, G, C and U. Thus, three nucleotides each consisting of four possibilities, A, G, C or U, is represented mathematically as $4^3$ ($4 \times 4 \times 4$) which equals 64 possible codons. Of the 64 possible codons, however, three codons, UAA, UAG and UGA, do not correspond to amino acids. Thus, there are 61 codons. *See, e.g., McGraw–Hill Encyclopedia of Science & Technology,* "Gene" at Vol. 7, page

740 (1997). For information on genetics, *see In re O'Farrell,* 853 F.2d 894, 895–899 (Fed. Cir.1988).

2. Scientists variously refer to this as "redundancy" or "degeneracy" in the genetic code. The term, "unique," refers to an amino acid coded by only a single codon. *See, e.g., Amgen Inc. v. Chugai Pharmaceutical Co. Ltd.,* 927 F.2d 1200, 1207–08 n. 4, (Fed.Cir.1991).

in plants and other organisms. For example, Table I of the '365 patent contains a listing of all 20 amino acids and the various codons which specify these amino acids. The table then compares the frequency with which each codon appears in plants. Similarly, Table V of the '365 patent contains a listing of the 20 amino acids along with their codon possibilities. The table compares the frequency with which each codon appears in dicot plants and the native *Btk* gene. (*Btk* refers to a type or strain of bacterium known as *Bacillus thuringiensis* var. *kurstaki*.)

Throughout this opinion, reference is made to "dicot" and "monocot" plants. These terms refer to two plant categories. To determine whether a plant is a monocot or dicot, one looks at the plant when it first comes out of the ground. If the plant has only one leaf when it first emerges from the soil, it is a monocot. If the plant has two leaves, it is a dicot. For example, tomato, tobacco and cotton are dicots; corn, barley, rice and wheat are monocots.

Knowing that different codons can specify the same amino acid, scientists attempted to solve the problem of low *Bt* expression in plants by changing the codons in the native *Bt* gene, without changing the resulting amino acids. Scientists recognized that different organisms prefer certain codons over others for specifying particular amino acids. With this knowledge, they sought to create a *Bt* gene that would have a codon frequency similar to that of plants, but produce high levels of pesticidal *Bt* protein.

Scientists attempting to increase *Bt* expression in plants discovered that *Bt* genes have a higher percentage of A and T nucleotides than plant genes. Scientists hypothesized that the increase in A and T and the presence of certain sequences in the bacterial *Bt* gene might be the cause of low *Bt* expression in plants. Who made this discovery, when it was made and how this discovery was used to design an insecticidal *Bt* gene are all key parts of this case.

### D. The Court's May 20, 1998 Claim Construction Hearing

#### 1. Overview of Claim Construction Issues

On May 20, 1998, the court held its claim construction hearing. The parties submitted pre- and post-hearing briefs. At the hearing, the court heard further argument from the parties, as well as the testimony of three experts, Dr. Nam–Hai Chua, Dr. Julia Bailey–Serres, and Dr. Joseph Falkinham, III.

The parties dispute the meaning of only one phrase of the claims at issue. Specifically, Claims 7, 8, 9 and 12 of the '365 patent all refer to a "modified chimeric gene." There are two methods for altering gene sequences to make a modified chimeric gene. The first method, known as site-directed mutagenesis, is the process of designing a gene by substituting one or more nucleotides at predetermined sites in a natural gene. The second method, known as chemical synthesis, is the process of creating synthetic DNA by chemically linking nucleotides in the proper sequence to produce the desired DNA sequence. The synthetic DNA is then incorporated into the native gene to alter the sequence.

Defendants argue that a "modified chimeric gene" includes only genes made by site-directed mutagenesis. Monsanto argues that a "modified chimeric gene" is a gene made by either method. At the conclusion of the claim construction hearing, the court determined that a "modified chimeric gene," as used in the '365 patent, includes a gene designed by either site-directed mutagenesis or chemical synthesis. The court explains its reasoning below.

#### 2. Hearing Testimony of Expert Witnesses

Dr. Nam–Hai Chua, a professor at Rockefeller University and the head of its plant molecular biology laboratory, testified for Monsanto. According to Chua,

site-directed mutagenesis is a method for altering DNA sequences at specific locations on a gene. He testified that one would use site-directed mutagenesis to make changes in discrete areas in a gene. According to Chua, chemical synthesis is a process where pieces of synthetic DNA are made and then incorporated into the native gene to alter the DNA sequence. Chua testified that one would use chemical synthesis to make changes in a large number of areas in the gene.

Chua testified that there is no difference between genes designed by site-directed mutagenesis and those designed by chemical synthesis, so long as the sequences changed by the different methods are identical. He further testified that the subject matter of the '365 patent concerns increasing *Bt* expression in plants, and that nothing in the patent is process-specific. According to Chua, the word "modified" in the '365 patent means "changes in the DNA sequence that are different from the native *Bt* sequence."

Dr. Julia Bailey–Serres, an associate professor of genetics specializing in plant gene expression at the University of California at Riverside, testified for Novartis. According to Bailey–Serres, site-directed mutagenesis involves synthesizing a short DNA sequence that differs from the native gene sequence in only a few nucleotides. The synthetic DNA is then hybridized, or bound, with native DNA, then enzymatically copied to produce a DNA sequence which is altered in a small, discrete region. She testified that chemical synthesis involves the insertion of a large piece of synthetic DNA into the native gene. This procedure alters large sections of the DNA sequence. Bailey–Serres testified that the '365 patent claims an invention in which specific gene sequences are altered by site-directed mutagenesis.

Dr. Joseph Falkinham, III, a professor of microbiology and genetics at Virginia Polytechnic Institute, testified for Mycogen. He agreed with Bailey–Serres's testimony about the differences between the two methods. Falkinham testified that the term "modified chimeric gene" refers to a gene designed by site-directed mutagenesis.

### 3. The Prosecution History Of The '365 Patent

On February 24, 1989, Monsanto filed U.S. Patent Application Serial No. 315,355 ("the '355 application") with the Patent and Trademark Office ("PTO"), naming David A. Fischhoff and Frederick J. Perlak as the inventors. This application, entitled "Synthetic Plant Genes And Method For Preparation," disclosed several different *Bt* genes, including genes with changes in a specific region referred to as the "240 region" or "B region."

The so-called 240 region of a native *Bt* gene is a region of 36 nucleotides beginning at the positions indicated below:

TTAATTAACCAAAGAATAGAAGAATTCGCTAGGAAC

1 5 10 15 20 25 30 35

Monsanto scientists learned that while *Bt* genes consist of approximately 62% A and T nucleotides, most plant and other bacterial genes consist of only 45% to 55% A and T nucleotides. Thus, Monsanto scientists discovered that by replacing certain A and T nucleotides with G and C nucleotides, the *Bt* gene became more plant-like. Throughout the prosecution history of the '355 application, Monsanto often referred to ATTTA sequences and polyadenylation sequences, which include sequences such as AATAAA, AATAAT, AACCAA, ATATAA, AATCAA and others.

On February 12, 1990, Monsanto filed an addendum to the '355 application, known as a continuation in part ("CIP"). The CIP added information and examples relating to the 240 region. The CIP also included the first use of the word "modified" in the claims. For example, Claim 30 claimed:

A chimeric plant gene which comprises a structural coding sequence encoding an insecticidal protein of [Bt], said structural coding sequence being modified to reduce the number of putative polyadenylation signals within said structural coding sequence.

A chimeric gene is an engineered gene produced by combining DNA sequences from more than one organism. See, e.g., In re Vaeck, 947 F.2d 488, 490 (Fed.Cir. 1991) (defining chimeric as a "[ (]hybrid) gene comprising (1) a gene derived from a bacterium of the Bacillus genus whose product is an insecticidal protein, united with (2) a DNA promoter effective for expressing the Bacillus gene in a host cyanobacterium, so as to produce the desired insecticidal protein"). At the Markman hearing, Monsanto argued that in the CIP, the word "modified" is used "to reduce the number of putative polyadenylation signals, which means one could reduce either one or all of them," and that "modified" was not used to impose a limitation on the way in which this reduction occurs.

After reviewing the '355 application, the PTO classified its claims as falling into two categories: either claims (1) "drawn to a method for improving a transformed gene in plants," known as method claims, or (2) "drawn to a modified Bt toxin structural gene, DNA per se, and transformed plant cells," known as gene claims. On October 1, 1991, the PTO asked Monsanto to restrict its claims to either method claims or gene claims pursuant to 35 U.S.C. § 121. This law provides that "[i]f two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions." 35

U.S.C. § 121 (1998). On October 29, 1991, Monsanto elected to restrict the claims to the second category, the modified Bt gene claims. Monsanto argued that choosing to restrict the claims to "modified Bt genes" demonstrates that the '355 application was not claiming "the way that the gene is to be manufactured."

On February 3, 1992, the PTO rejected all claims either under § 112 for lack of adequate written description and lack of enablement, or under § 103 for obviousness.

In response, on April 22, 1992, Monsanto filed an amendment to the claims. Monsanto made several changes to the claims including adding the word "modified" before "structural gene" in certain claims. For example, Claim 13, as amended, read:

A modified structural gene which encodes an insecticidal protein of Bacillus thuringiensis, wherein a naturally occurring structural gene of Bacillus thuringiensis has been modified to remove a sufficient number of polyadenylation signals and ATTTA sequences so as to increase expression of said protein in a plant cell.

In response to the PTO's § 112 objection, Monsanto argued that "[t]he application enables anyone of ordinary skill in the art to modify any DNA sequence from any Bt strain from its naturally occurring sequence so as to remove polyadenylation signals and ATTTA sequences." Monsanto also argued that the "present claims are reasonably crafted to include the subject matter to which applicants regard as their invention and to which they are entitled, which is a modified structural gene and a plant containing the claimed modified structural gene."

In response to the PTO's § 103 objection, Monsanto distinguished its invention from the prior art by stating that "none of the references relied upon by the examiner suggests or discloses ATTTA sequences and none of the references provides any suggestion or disclosure of replacing ATT-

TA or polyadenylation sequences in a structural gene to increase expression of a gene or that these sequences have any effect on the expression of a gene in any cell."

On July 13, 1992, the PTO rejected all claims. The PTO rejected some of the amended claims under 35 U.S.C. § 132 because the amended claims added new matter into the specification. The PTO rejected the remaining claims under either § 112 or § 103.

On October 9, 1992, Monsanto filed a continuation application, U.S. Application Serial No. 959,506, from which the '365 patent eventually issued. In the continuation application, Monsanto argued that "the claims have been amended so as to only encompass modified chimeric genes and not encompass naturally occurring structural coding sequences in which the claimed modifications have not been made."

In the continuation application, Monsanto argued that it had developed "a method for modifying the structural coding sequence which codes for the proteins from *Bt* to increase the expression of a chimeric gene containing that structural coding sequence in plant cells." Monsanto further argued that the "application enables anyone of ordinary skill in the art to modify any DNA sequence from any *Bt* strain from its naturally occurring sequence so as to remove polyadenylation signals and ATTTA sequences." At the claim construction hearing, Monsanto argued that this clarification of the claims shows that the word "modified" has no particular significance related to the method of how the gene is made.

In the continuation application, Monsanto also argued that "[t]he claimed invention is not rendering the structural coding sequences 'plant preferred.' Indeed, some of these changes can result in changing to a less preferred codon for a particular amino acid." At the hearing, defendants argued that this statement shows that Monsanto "surrendered during the prose-

cution the subject matter of the synthetic gene made by plant preferred codons."

On June 1, 1993, the PTO again rejected the claims under either § 112 or § 103.

On October 4, 1993, Monsanto filed an amendment to clarify the term "modified." Monsanto noted:

> The issue discussed in the earlier Office Action and discussed in the interview was that the claims may encompass *Bt* toxin proteins that may naturally not have to be modified (i.e., may not meet any of the criteria set forth in the claims where change would be required). The claims have been amended so as to only encompass *modified* chimeric genes and not encompass naturally occurring structural coding sequences in which the claimed modifications have not been made.

In the amendment, Monsanto also stated that "[i]n the invention as claimed, only [the] structural coding sequence is modified to increase the expression of the chimeric gene." Additionally, "[t]he claimed invention is directed to changes in the structural coding sequence and not in noncoding regions." Monsanto wrote that the claimed invention uses "a method which involves modifying some, but not all, ATTTA sequences and polyadenylation sequences."

On January 25, 1994, the PTO again rejected all claims.

On May 25, 1994, Monsanto again amended the claims to "rewrite the claims to be in product format, rather than product-by-process format," and to clarify the language in the claims. In particular, Monsanto amended Claim 43, which became Claim 1 of the '365 patent, to state that the *Bt* gene structural coding sequence has "a DNA sequence which differs from the naturally occurring DNA sequence encoding said *Bacillus thuringiensis* protein."

On September 9, 1994, the PTO announced the allowability of some of Mon-

santo's claims, and finally rejected the remaining claims. The PTO explained:

> Again, the claims, as written, read upon almost *any* (silent) alteration to the coding sequence of the gene, either recombinant or chemical, etc. The claims are not within the enablement of the specification, as they do not provide one of ordinary skill in the art with a mode of 'modification' of the gene. There is no basis given for one of ordinary skill in the art to determine what amount would constitute as an 'increase' in expression.

Furthermore, the PTO concluded that "the claims are not even limited to the recombinant replacement of the target sites in the genes." On October 12, 1994, Monsanto canceled the rejected claims.

On November 1, 1994, the PTO suspended prosecution of the pending claims for six months, explaining that "[a] reference relevant to the examination of [Monsanto's] application may soon become available." This reference was U.S. Patent No. 5,380,831 ("the '831 patent"), which the PTO issued to Mycogen's predecessor on January 10, 1995. The '831 patent named Michael J. Adang as one of the inventors. The '831 patent discloses a method for creating "[s]ynthetic [*Bt*] toxin genes designed to be expressed in plants at a level higher than naturally-occurring *Bt* genes are provided." A synthetic *Bt* gene is a gene created by chemical synthesis.

On March 7, 1995, the PTO withdrew its previous allowance of the claims pending in the '355 application, and rejected all claims "in view of the newly discovered prior art to Adang *et al.*, U.S. Patent 5,380,831." The PTO wrote that "[t]he references teach several points regarding the problems of expression in plants due to the A+T sequence-rich regions causing polyadenylation and/or splicing in the codon regions, and Adang *et al.* ('831) provide a successful and demonstrated means to solve the problem." Furthermore, the PTO stated that the prior art "provided one of ordinary skill in the art with the necessary information to delete and/or replace codons that were detrimental to the heterologous *Bt* gene expression in plants."

On April 26, 1995, Monsanto filed another continuation application. Monsanto distinguished its invention from the '831 patent by emphasizing that Monsanto's invention focused on making changes in the 240 region. Monsanto argued that its invention was "directed to the discovery that when one eliminates certain sequences and when one increases plant preferred codons, that some changes are more important than others and that certain locations in the *Bt* gene are more important to change to achieve *Bt* gene expression than other locations." Monsanto compared this to the '831 patent which "does not distinguish any region of the *Bt* gene from any other region of the *Bt* gene."

Additionally, Monsanto noted that specific claims "are directed to the discovery by application of a result effective region of *Bt* genes that when modified to remove the occurrence of certain sequences, can improve the expression of the *Bt* gene in plant cells dramatically." Monsanto also argued that "[w]hile Claims 43, 44 and 51 are open to changes in other regions, they *require* changes in the [240] region, which has been shown to be more result effective than any other region." Claim 43 became Claim 1 of the '365 patent.

On October 4, 1995, the PTO finally rejected all claims under § 112 and § 103, explaining that "[t]he combination of teachings of the prior art, either generally or specifically, set forth the ideas of the instant invention." Additionally, the PTO noted that "[t]he instantly disclosed '[240] region,' as well as others, are encompassed by the teachings of the prior art," and the "fact that some regions in the sequence respond better than others is still regarded as encompassed by the teachings of the prior art."

On October 24, 1995, Monsanto filed an amendment to the '355 application. Mon-

santo stated that "[t]he pending claims are limited to that subset of modified *Bt* genes that at least have modifications in a particular region, which has been referred to in the previous response as the 'B region' or '240 region' and plant cells that contain a modified *Bt* gene that has modifications in the 'B region' or in the '240 region.'"

In the amendment, Monsanto emphasized the differences between its claimed invention and the prior art. Monsanto argued that "[n]one of the cited art, other than [the '831 patent], discusses modifying the structural coding sequences of *Bt* genes for the purpose of improving the expression of those structural coding sequences in plant cells." Additionally, while not agreeing with the PTO's characterization of the '831 patent as prior art, Monsanto noted that the '831 patent "only generally describes modifications and does not render obvious the claimed invention." Comparing its invention with the prior art, Monsanto stated that its "claimed invention ... requires that those *Bt* genes that contain the 'B' or '240' region must have certain modifications in at least that region."

Monsanto described the claimed invention as "directed to a chimeric gene modified in a particular region." Monsanto noted:

> None of the cited art provides an example of a *Bt* gene containing a modified "B" [240] region. None identifies the "B" [240] region for any purpose. None of the cited art discloses that one skilled in the art should modify any region or that modifications in one region are more result effective than any other region. None of the cited art discloses modifying a *Bt* gene to remove the occurrence of sequences that occur in the "B" region, *i.e.*, AATTAA or AACCAA sequences.

Co-inventor Fischhoff filed a declaration with the amendment, in which he declared that the '831 patent "has only one example of a synthetic *Bt* gene, a *Btt* gene shown in Figure 1. This gene does not contain a 'B'

or '240' region." *Btt* refers to *Bacillus thuringiensis* var. *tenebrionis*.

On November 14, 1995, the PTO announced that the claims in the '355 application were ready for allowance. On December 13, 1995, a Monsanto attorney filed a request for early issuance on the basis that the "claims are being infringed upon."

### 4. *The '365 Patent*

The PTO issued the '365 patent on March 19, 1996. The patent, entitled "Synthetic Plant Genes," discloses a "method for modifying structural gene sequences to enhance the expression of the protein product" and "novel structural genes which encode insecticidal [*Bt*] proteins." The '365 patent discloses a method to increase production of *Bt* toxin by replacing *Bt* gene sequences believed to reduce *Bt* expression in plants with sequences believed to enhance *Bt* expression in plants. The invention results in insect-resistant plants.

The "Statement of the Invention," found at column 7, lines 32–35 of the patent's specification, reads: "[t]he present invention provides a method for preparing synthetic plant genes which genes express their protein product at levels significantly higher than the wild-type genes." At column 10, lines 1–13, the patent's specification describes the invention:

> In its most rigorous application, the method of the present invention involves the modification of an existing structural coding sequence ("structural gene") which codes for a particular protein by removal of ATTTA sequences and putative polyadenylation signals by site-directed mutagenesis of the DNA comprising the structural gene. It is most preferred that substantially all the polyadenylation signals and ATTTA sequences are removed although enhanced expression levels are observed with only partial removal of either of the above identified sequences. Alternately if a synthetic gene is prepared which codes for the expression of the subject protein,

codons are selected to avoid the ATTTA sequence and putative polyadenylation signals.

The patent's specification, describing a figure accompanying the text, notes that "[a]nother embodiment of the present invention, represented in the flow diagram of Figure 1, employs a method for the modification of an existing structural gene or alternately the *de novo* synthesis of a structural gene which method is somewhat less rigorous than the method first described above." *See* column 10, lines 22–27.

At column 12, lines 30–34, the specification states that it should be clear to those skilled in the art that "while the above description [of regions with 'many consecutive A + T bases or G + C bases'] is directed toward the modification of the DNA sequences of wild-type genes, the present method can be used to construct a completely synthetic gene for a given amino acid sequence." Additionally, the patent's specification states that the DNA construct of the invention contains "a modified or fully-synthetic structural coding sequence which has been changed to enhance the performance of the gene in plants. In a particular embodiment of the present invention the enhancement method has been applied to design modified and fully synthetic genes, encoding the crystal toxin protein of [*Bt* ]." Column 13, lines 49–55.

The '365 patent consists of twelve claims. Claims 7, 8, 9 and 12 are the four asserted claims at issue in this case. Claim 7 is independent and reads:

A modified chimeric gene comprising a promoter which functions in plant cells operably linked to a structural coding sequence and a 3′ non-translated region comprising a polyadenylation signal which functions in plants to cause the addition of polyadenylate nucleotides to the 3′ end of the RNA, wherein said structural coding sequence encodes a toxin protein derived from a *Bacillus thuringiensis* protein, wherein said structural coding sequence comprises a DNA sequence which differs from the naturally occurring DNA sequence encoding said *Bacillus thuringiensis* protein and comprises the following characteristics:

said naturally occurring DNA sequence comprises a region having the following sequence:

TTAATTAACCAAAGAATAGAAGAATTCGCTAGGAAC

1 5 10 15 20 25 30 35

and where said structural coding sequence comprises modifications so that at least said region contains at least one fewer sequence selected from the group consisting of an AACCAA and an AAT-TAA sequence.

Claim 8 depends from Claim 7 and claims "[t]he modified chimeric gene of claim 7 wherein said modifications increase the number of plant preferred codons in said structural coding sequence." Claim 9 also depends from Claim 7 and claims "[t]he modified chimeric gene of Claim 7 wherein said *Bacillus thuringiensis* is *Bacillus thuringiensis* var. *kurstaki*."

Claim 12 is independent and reads:

A transformed plant cell comprising a modified chimeric gene which comprises a promoter which functions in plant cells operably linked to a structural coding sequence and a 3′ non-translated region comprising a polyadenylation signal which functions in plants to cause the addition of polyadenylate nucleotides to the 3′ end of the RNA, wherein said structural coding sequence encodes a toxin protein derived from a *Bacillus*

*thuringiensis* protein, wherein said structural coding sequence comprises a DNA sequence which differs from the naturally occurring DNA sequence encoding said *Bacillus thuringiensis* protein and has characteristics comprising the following:

said naturally occurring DNA sequence comprises a region having the following sequence:

TTAATTAACCAAAGAATAGAAGAATTCGCTAGGAAC

1　　5　　10　　15　　20　　25　　30　　35

and wherein said structural coding sequence comprises modifications so that at least said region contains at least one fewer sequence selected from the group consisting of an AACCAA and an AAT-TAA sequence.

### 5. What is the Legal Standard for the Court's Claim Construction?

■ The court construes claims according to their "ordinary and accustomed meaning," *see Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed.Cir.1998), and from the vantage point of a person of ordinary skill in the art at the time of the invention. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed.Cir.1995) (*en banc*), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In construing a claim, a court looks first to the intrinsic evidence of record, namely, the language of the claim, the specification, and the prosecution history. *Insituform Tech. Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1198, 117 S.Ct. 1555, 137 L.Ed.2d 703 (1997).

■ The claim language itself defines the scope of the claim. However, the court may interpret a term in a patent claim to have a meaning other than the one a person of ordinary skill in the art would give it if it is apparent from the patent and the prosecution history that the inventor intended a different meaning. *See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1579 (Fed.Cir.), *cert.* denied, 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996).

■ The court may consider expert testimony if needed to assist it in understanding the meaning or scope of technical terms in a claim. *See Hoechst*, 78 F.3d at 1579. However, the court should not rely on any extrinsic evidence where the claims, specification, and file history unambiguously define the scope of the claim. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996); *see also Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1307 (Fed.Cir.1999).

Although the Court of Appeals for the Federal Circuit has held that claims should be read in light of the specification, *Vitronics Corp.* at 1582, the court has repeatedly cautioned against limiting the scope of a claim to the preferred embodiment or specific examples disclosed in the specification. *See e.g., Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed.Cir.1997); *Intervet America, Inc. v. Kee–Vet Laboratories, Inc.*, 887 F.2d 1050, 1053 (Fed.Cir. 1989) (explaining that it is "improper" to read an extraneous limitation from the specification into the claim).

### 6. How Does the Court Construe the Term at Issue, "Modified"?

■ Claims 7, 8, 9 and 12 all refer to a "modified chimeric gene." Monsanto argues that "modified" (as well as variations of the word, including "modify" and "modification") means changes to the naturally occurring gene sequence, whether by site-directed mutagenesis or by chemical synthesis. Defendants argue that "modified"

only includes changes by site-directed mutagenesis. The patent does not specifically define the method by which structural gene sequences are modified.

The specification discusses genes designed by chemical synthesis. For example, at column 6, lines 30 to 33, the patent's specification explains that "it is an object of the present invention to provide a method for preparing synthetic plant genes which express their respective proteins at relatively high levels when compared to wild-type genes."

The specification also discusses genes designed by site-directed mutagenesis. For example, at column 10, lines 1–6, the specification states that "[i]n its most rigorous application, the method of the present invention involves the modification of an existing structural coding sequence ('structural gene') which codes for a particular protein by removal of ATTTA sequences and putative polyadenylation signals by site-directed mutagenesis of the DNA comprising the structural gene."

The specification discusses both site-directed mutagenesis and chemical synthesis. For example, an entire section of the specification, entitled "Synthetic Oligonucleotides For Mutagenesis," discusses how the "oligonucleotides used in the mutagenesis are designed to maintain the proper amino acid sequence" in the "modified gene." This section concludes by explaining that "[i]t is evident to those skilled in the art that while the above description is directed toward the modification of the DNA sequences of wild-type genes, the present method can be used to construct a completely synthetic gene for a given amino acid sequence." Column 12, lines 30 to 34.

Similarly, Table III of the specification "lists the synthetic oligonucleotides designed and synthesized for the site-directed mutagenesis of [a specific Bt] gene." And the specification discusses "hybrid genes, part wild-type, part synthetic, [which] were generated to determine the effects of synthetic gene segments on the levels of B.t.k. expression." Column 18, lines 62 to 67.

These portions of the specification demonstrate that a synthetic gene can be designed by chemical synthesis, or a synthetic gene sequence can be designed and inserted into predetermined sites in a native gene by site-directed mutagenesis. As explained throughout the specification, the '365 patent encompasses genes that are partially synthetic in a specific region and genes that are synthetic throughout the entire gene. Thus, from reading the specification, the court determines that "modified" refers to genes with changes by either site-directed mutagenesis or by chemical synthesis.

The court finds that the prosecution history of the '365 patent provides further support for this determination.

From the beginning of the prosecution of the '355 application, Monsanto focused on making changes to the 240 region of the gene. For example, responding to the PTO's request that Monsanto restrict its claims to either method claims or gene claims, Monsanto decided not to claim the process for designing the genes, whether by site-directed mutagenesis or by chemical synthesis. Rather, Monsanto claimed genes with changes in the 240 region, regardless of the process involved in designing the genes.

As the prosecution history demonstrates, Monsanto continually distinguished its claimed invention from the prior art on the grounds that its invention identified the 240 region as the "result effective" or key region. Notably, Monsanto did not distinguish its invention on the grounds that the prior art claimed genes designed by chemical synthesis, as opposed to genes designed by site-directed mutagenesis.

For example, after the PTO suspended prosecution of the '355 application when it issued the '831 patent, Monsanto filed a declaration from Fischhoff. In this decla-

ration, Fischhoff distinguished the invention from the '831 patent on the basis that the '831 patent did not specify the 240 region, not on the basis of whether the gene was created by site-directed mutagenesis or chemical synthesis.

The PTO recognized that Monsanto was not focusing on the specific process for making changes to the 240 region. For example, on September 9, 1994, the PTO noted that the "claims are directed to a gene, and not a method of increasing expression or a host organism, etc." Similarly, the PTO remarked that "[a]gain, the claims, as written, read upon almost *any* (silent) alteration to the coding sequence of the gene, either recombinant or chemical, etc." The PTO further stated that "the claims are not even limited to the recombinant replacement of the target sites in the genes."

Thus, as both the specification and the prosecution history demonstrate, the '365 patent does not impose any limitation on the process by which a gene is designed to enhance *Bt* expression. Rather, the '365 patent encompasses genes designed by both methods: site-directed mutagenesis and chemical synthesis. Furthermore, the '365 patent and the prosecution history demonstrate that the only limitation imposed by the claimed invention is that the native *Bt* gene is changed, regardless of the manner in which the change occurs.

Claims 7 and 12 of the '365 patent refer to a "modified chimeric gene" with a structural coding sequence which "comprises a DNA sequence which differs from the naturally occurring DNA sequence." Additionally, the claims refer to the 240 region as the "naturally occurring DNA sequence" in which "modifications" are made so that "at least said region contains at least one fewer sequence selected from the group consisting of an AACCAA and an AATTAA sequence." Thus, it appears from "the ordinary and accustomed meaning of claim terms" that the word "modified" is used to draw a distinction between a gene that has alterations to the 240 region and a gene that is naturally occurring. *See, e.g., Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed.Cir.1999) ("[A] court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms.").

Additionally, throughout the prosecution history, Monsanto explained that the claimed invention "enables one of ordinary skill in the art to modify any DNA sequence from any *Bt* strain from its naturally occurring sequence so as to remove polyadenylation signals and ATTTA sequences." Monsanto did not use language that would limit these modifications to only those made by site-directed mutagenesis.

Accordingly, the court concludes that the word "modified," and variations of the word, including "modify" and "modification," means altered or changed from the naturally occurring gene sequence, irrespective of the manner in which the changes are made. Thus, a "modified chimeric gene," as used in the '365 patent, includes a gene designed by either site-directed mutagenesis or a gene designed by chemical synthesis, with changes in the 240 region.

### E. The Jury Trial

#### 1. Monsanto's Case–in–Chief

At trial, Monsanto set out to prove that Mycogen and Novartis are infringing the '365 patent by selling insect-resistant corn seeds. According to Monsanto, these seeds have incorporated into their genetic material the modified *Bt* gene that enables the corn to manufacture pesticidal proteins. This is the same modified *Bt* gene that the '365 patent discloses.

Monsanto argued that Perlak and Fischhoff were the first to invent the modified *Bt* gene that works so successfully in the defendants' infringing corn products. Perlak and Fischhoff made this invention after much experimentation involving different

scientific approaches. In 1986, they devised a strategy that they implemented the following year. An integral part of this strategy included identification of the *Bt* gene's 240 region as the "result effective" portion of the nucleotide sequence where certain nucleotide changes can bring about great increases in pesticidal protein production. By the summer of 1988, test results confirmed that Fischhoff and Perlak had built a synthetic *Bt* gene that produced pesticidal proteins in transformed plants.

As its first witness, Monsanto called Dr. Stephen G. Rogers, a Monsanto scientist specializing in plant genetics. According to Rogers, at the time he joined Monsanto in 1980, the scientific community had not been able to "transform" plants, which he defined as introducing a foreign gene into a plant so that the introduced trait is passed on to subsequent generations of the plant, a process known as "inheritancy." Rogers testified that Monsanto successfully transformed plants in the fall of 1982, and announced its work publicly in January 1983. In April 1983, Monsanto scientists published a paper on their transformation work. *See* Fraley *et al.*, "Expression of Bacterial Genes in Plant Cells," *in Proc. Nat'l Acad. Sci. USA* 80:4803–4807 (1983). By 1984, Monsanto scientists demonstrated that the genes of the transformed plants achieved inheritancy.

Rogers testified at length about genes. According to Rogers, all genes have a promoter, a structural coding sequence and a 3' non-translated end. The promoter controls how many copies of RNA are made; the structural coding sequence controls which proteins are made; and the 3' non-translated end is the last part of a gene.

Referring to a Monsanto document, Rogers testified that on February 15, 1984, he and his colleagues produced a confidential paper entitled, "Codon Usage by Nuclear Plant Genes." This paper included a codon usage table. He testified that scientists use codon usage tables to determine the frequency with which certain codons appear in plants and other organisms. For example, the abstract from this paper states that "genes from dicotyledonous plants [dicots] seldom use the codon families CGX, XCG and XUA."

Rogers testified that Monsanto scientists, including Fischhoff and Perlak, began working on inserting *Bt* into plants as early as 1983. According to Rogers, their first attempts involved taking the entire coding sequence for the native *Bt* protein, inserting it into vectors and transporting the coding sequence into plant cells. Vectors are DNA molecules used to carry or shuttle the gene into the plant. *See, e.g., Ajinomoto Co. Inc. v. Archer–Daniels–Midland Co.*, 1996 WL 621837, *6 (D.Del. Oct.21, 1996). Rogers testified that Monsanto scientists succeeded in vectoring the entire coding sequence of native *Bt* into plants like tomato and tobacco. They discovered, however, that these genetically-modified plants did not produce enough *Bt* pesticidal protein. The level of expression of the native *Bt* genes inserted into the plants was too low.

Rogers testified that after studying these results, Monsanto scientists realized they did not need to insert into the plant the entire coding sequence of the native *Bt* protein to get the levels of expression they desired. Hence, they made truncated genes and shuttled these genes into plants, using vectors. Rogers testified that expression was a little better with these transformed plants compared to plants transformed with the entire coding sequence of the native *Bt* protein. However, the level of expression of the truncated genes was still too low to be commercially viable.

According to Rogers, by 1986, Fischhoff became Monsanto's lead scientist responsible for "solving [the] *Bt* problem." Fischhoff reported directly to Rogers. Rogers testified that in September or October 1986, he and Fischhoff met to review data. They concluded that the transformed

plants with the truncated genes had very little RNA. Since RNA is needed to make protein, they reasoned that the lack of RNA explained the low expression of *Bt* protein. Rogers referred to a two-page Monsanto memorandum, dated October 30, 1986. He testified that Fischhoff prepared this memorandum at his request as a summary of what they discussed at their meeting and what their research plans were.

Rogers testified that the October 30, 1986 memorandum identifies AT-rich regions in the *Bt* coding sequence as a cause of RNA instability in plant cells because the plant misinterprets the AT-rich regions. According to Rogers, Monsanto scientists considered two approaches to solve the problem of low *Bt* expression in plants.

One approach involved site-directed mutagenesis to identify and modify the most problematic AT-rich regions of the coding sequence. He testified that the second approach involved chemical synthesis which changes all of the coding sequence to create a synthetic gene. Rogers testified that chemical synthesis is a much broader approach requiring more resources than site-directed mutagenesis. Rogers testified that regardless of which process is used to make a new gene, the new gene operates in the same way: "In the end you have a DNA that has changes in it."

Rogers testified that the memorandum lists several possible causes of RNA instability including: (1) specific signals for RNA degradation; (2) signals for improper polyadenylation of the RNA; (3) premature termination of transcription; and (4) signals for improper splicing of the RNA.

Rogers testified about a December 19, 1986 memorandum he wrote. He testified that the memorandum indicates that Fischhoff and Perlak planned to start doing site-directed mutagenesis in 1987 for the purpose of changing specific regions of the DNA coding sequence to increase *Bt* protein expression. He also referred to a memorandum prepared by Fischhoff outlining goals for 1987 to show that one of the scientists' goals in 1987 included maximizing stable expression of chimeric *Bt* toxin genes. According to the memorandum, Monsanto's scientists set a specific goal of constructing a modified *Btk* toxin gene to show a ten-fold increase in insect resistance. Rogers testified that the synthetic *Btk* genes they constructed achieved a one hundred- to five hundred-fold increase in insect resistance.

Rogers testified that Fischhoff and Perlak reported to him throughout 1988. He testified that his responsibilities included preparing governmental regulatory-related work and drafting field test applications for *Bt* plants. According to Rogers, genetically-modified insect-resistant plants required approvals from several government agencies including the U.S. Department of Agriculture, the Food and Drug Administration and the Environmental Protection Agency. Rogers testified that the required regulatory submissions for Monsanto's *Bt* corn were made in "about 1995."

On cross-examination, Rogers testified that neither his December 19, 1986 memorandum nor Fischhoff's memorandum discussing goals specified the exact coding sequences Fischhoff would put into his synthetic gene. Similarly, Rogers testified that while these documents indicate that the modified gene would include fewer polyadenylation sequences, they did not provide information that would enable him to predict which would be the most important polyadenylation sequences to remove. According to Rogers, at about the same time Monsanto announced it had successfully transformed plants in 1983, two other scientists, Mary–Dell Chilton and Jeff Schell, made similar announcements. Rogers testified that Chilton, a former Monsanto consultant, provided strains and plasmids for Monsanto's work.

Plasmids are small circular pieces of DNA found in bacteria, separate from genomic DNA, which are capable of replication. Unlike plants and animals, bacteria

lack chromosomes; instead, they have one large circle of DNA containing all the genes, and smaller circles of plasmid DNA. Plasmids are a convenient tool for molecular biologists because their small size makes them easy to manipulate. Short pieces of DNA can be designed with a specific nucleotide sequence, synthesized and spliced into the plasmid. *See, e.g., In re O'Farrell*, 853 F.2d 894, 898 (Fed.Cir. 1988).

Monsanto next called Thomas B. Klevorn, a Monsanto executive. According to Klevorn, from 1993 to 1996, he worked on developing *Bt* corn as Monsanto's *Bt* corn team leader. From 1996 to 1998, he worked on licensing issues related to *Bt* corn and on cultivating relationships with seed companies that might want to commercialize *Bt* corn technology. He testified that it took Monsanto from February 1993 to December 1996 to gain the necessary government regulatory approvals for its *Bt* corn products.

Klevorn testified that in 1993, Monsanto had a *Bt* corn gene, known as the 5373, as well as some transformed plants "just ready to start into the commercial pipeline." According to Klevorn, Monsanto made its first *Bt* corn plants on June 14, 1990. These plants, however, could not be commercialized because they were either infertile or did not adequately express *Bt* pesticidal protein. Klevorn testified that Monsanto did not have a *Bt* corn plant with characteristics that could be commercialized until June 16, 1992. These *Bt* corn plants were called "Ezra." According to Klevorn, Monsanto eventually registered the trademark "YieldGard" for the Ezra plants. Monsanto received regulatory approval for Ezra in December 1996.

Klevorn testified that Monsanto licensed its 5377 gene to Sandoz from which Sandoz developed a commercial corn product known as *Bt* 11. According to Klevorn, *Bt* 11 is also a YieldGard product. On cross-examination, Klevorn testified that Ciba and Mycogen were both selling *Bt* corn before any Monsanto licensee was selling *Bt* corn with a Monsanto gene in it.

As part of its infringement case, Monsanto called Dr. Nam–Hai Chua, who testified at the claim construction hearing. Chua testified that the '365 patent provides a general method for increasing the expression level of *Bt* protein in plants. According to Chua, the patent directs particular significance to the 240 region of the gene, so named because the region starts at the gene's 240th codon position.

According to Chua, Fischhoff and Perlak were the first scientists to publish an article describing the production of insect-resistant cotton plants. Chua testified that Fischhoff and Perlak also published a paper in which they described the modifications to be made to coding sequences of the *Bt* gene's 240 region to increase *Bt* expression in plants. *See* Perlak *et al.*, "Modification of the Coding Sequence Enhances Plant Expression of Insect Control Protein Genes," *Proc. Nat'l Acad. Sci.*, 88:3324–3328 (Apr.1991).

Chua testified that other scientists independently confirmed Fischhoff and Perlak's work. *See* van der Salm *et al.*, "Insect Resistance of Transgenic Plants that Express Modified Bacillus Thuringiensis Cry1A(b) and Cry1C Genes: A Resistance Management Strategy," *Plant Molecular Biology*, 26:51–59 (1994). He testified that these same researchers confirmed that modifications to the 240 region removing AATTAA and AACCAA sequences led to better expression of *Bt* protein in plants. *See id.*

According to Chua, Claim 7 of the '365 patent refers to a modified chimeric gene which he defined as a gene that has been changed from the native *Bt* gene so that it has parts derived from different sources. The gene described in Claim 7 has a promoter which he described as an engine that starts the copying of RNA in the gene of the plant host. Claim 7 provides that the promoter is "operably linked" to the "structural coding sequence" which contains the necessary genetic information for

making protein. The promoter starts the "expression of the coding sequence."

Chua testified that the 3' non-translated region, also known as the 3' polyadenylation signal or 3' poly-A addition signal, is the part of the gene that does additional processing to the RNA. The 3' non-translated region adds a series of A nucleotides making the RNA functional and ending RNA copying. Chua testified that the 3' non-translated region must be located at the end of the gene, otherwise the cell gets its processing confused and the RNA becomes garbled. According to Chua, a polyadenylation signal consists of six nucleotides or two codons.

Chua testified that Claim 7 requires that the structural coding sequence encodes a toxin protein derived from *Bt*. This structural coding sequence comprises a DNA sequence which differs from the naturally-occurring DNA sequence encoded with the *Bt* toxin. Chua testified that the structural coding sequence differs in that its 240 region has been modified to remove at least one or both of the following polyadenylation signals, AACCAA and AATTAA.

According to Chua, Claim 7 teaches that. at least two changes must be made to the structural coding sequence. One or both changes can be made inside the 240 region or one change can be made inside the 240 region and the other outside the 240 region. Chua testified that the change inside the 240 region has to change the AACCAA or AATTAA sequence. He testified that the AACCAA and AATTAA sequences found in the 240 region are bad if they occur within the structural coding sequence because they transmit incorrect messages to the cell.

Chua testified that a sequence, known as a file upstream element, also works in conjunction with polyadenylation signals. File upstream elements, however, were not known in 1989 when Fischhoff and Perlak filed their patent application.

Chua testified that Claim 8 teaches that the modifications made in Claim 7 must

increase the number of plant preferred codons in the structural coding sequence. He testified that the patent includes Monsanto's codon usage table prepared by Rogers. It would be used as a guide when one selects plant preferred codons.

Chua testified that Claim 9 requires that the modified chimeric gene of Claim 7 has to be derived from *Btk*. According to Chua, Claim 12 is very similar to Claim 7 except that in Claim 12, the modified chimeric gene described in Claim 7 has been inserted into a plant cell.

Chua testified that the '365 patent lists a number of genes, including the 5370, 5377 and 5383 genes, which have high *Bt* expression in plants. He testified that in all these genes, the 240 region had been modified to remove the AATTAA and AACCAA sequences. According to Chua, Table IV of the '365 patent, entitled "Relative Effects of Regional Modifications Within the *Btk* Gene," reports results in which structural coding sequences of different parts of seven *Bt* genes have been modified, inserted into plants and the plants' insect-killing activity measured. Chua testified that these results show that when changes were made to the 240 region, the percentage of insect-killing plants was high whereas when changes were made outside the 240 region, the percentage of insect-killing plants was low.

With respect to infringement issues, Chua testified that the Novartis Event 176 gene, also known as the Ciba gene, infringes Claims 7, 8, 9 and 12 of the '365 patent. According to Chua, the Event 176 gene includes two promoters, a modified coding sequence in its 240 region and a 3' non-translated region. The Event 176 gene has the same 36 nucleotides of the 240 region as set out in Claim 7. It uses plant preferred codons as set out in Claim 8, and it derives from *Btk* as set out in Claim 9. The gene has also been inserted into a plant as set out in Claim 12.

On cross-examination, Chua testified that while Fischhoff and Perlak identified

AACCAA and AATTAA as problem sequences in the *Bt* gene, they were not the first scientists to discover polyadenylation signals. Rather, Fischhoff and Perlak listed potential polyadenylation signals based on their review of the scholarship pertaining to animal and plant genetics. Chua testified that the '365 patent does not recognize the importance of the upstream element. He testified that it is not identified as a problem sequence in the patent because the scientific community did not know about the upstream element at that time. Chua testified that while Claim 7 teaches what bad sequences to remove, it does not teach how to actually remove them. According to Chua, the specification teaches that the addition of new polyadenylation sequences should be avoided and that the amino acid coding sequence must be maintained.

On cross-examination, Chua testified that Monsanto synthesized a gene, known as construct pMON 105338, which did not have any modifications made to its 240 region, and still expressed well, estimated by Chua as thirty percent. According to Chua, the specification acknowledges construct pMON 105338's expression by noting that "[t]he levels of expression do not appear to be as high as those seen with the synthetic gene but are comparable to the modified gene levels." Chua testified that as construct pMON 105338 shows, there are other ways of increasing expression of the gene by making changes outside the 240 region. According to Chua, the claims of the '365 patent do not teach one how to make changes to the genes but the specification does.

On cross-examination, Chua testified that Fischhoff and Perlak employed Monsanto's codon usage table which he described as a compilation of codon usage of different plants. He testified that Ciba employed a maize codon usage table for modifications made to its Event 176 gene. Chua testified that the Event 176 gene is totally different from Monsanto's gene because the designers employed different codon usage tables. However, while the Ciba gene has a different coding sequence from Monsanto's gene, the bad sequences were removed from the 240 region in both.

On redirect, Chua testified that Table VIII of the '365 patent shows the expression of *Btk* protein in plants for three different genes, including a native *Btk* gene, a modified gene, known as the 5370, and a synthetic gene, known as the 5377. Chua testified that the 5370 expressed 100 times better than the native *Btk* gene and the 5377 expressed 500 times better than the native *Btk* gene.

On redirect, Chua testified that in Table IX, the patent points out two factors to be considered when determining plant protection from insects. These factors are the insect killing capabilities of the plant, and the leaf damage rating. According to Chua, one wants to kill insects and more importantly, protect the leaves from insect damage. In other words, one does not want insects feeding on the plant leaves.

On redirect, Chua testified that upstream elements, unknown to Fischhoff and Perlak at the time of filing the patent application, when combined with polyadenylation signals make the coding sequences particularly bad. According to Chua, by changing the AATTAA and AACCAA in the 240 region, the upstream element is negated. Chua testified that the Event 176 event gene is 77% identical to Monsanto's gene, meaning that 77% of the nucleotide sequence is identical for the two genes. He testified that "there's a very high sequence identity in these two genes."

Monsanto read excerpts of the deposition testimony of Michael Gene Koziel, the scientist who designed the Event 176 gene. Koziel testified that he had overall responsibility for Ciba's *Bt* corn project from September 1988 to 1992. According to Koziel, he designed Ciba's synthetic gene to encode a specific *Bt* protein; his synthetic gene was not modified from the native *Bt* sequence.

During his testimony, Koziel referred to pages from his laboratory notebook. He testified that for his designing work, he employed a maize codon usage table published in an article by Murray in 1989. *See* E. Murray *et al.*, "Codon Usage in Plant Genes," *Nucleic Acids Research* (1989). Referring to a facsimile document, dated May 3, 1991, from Koziel to Bruce Lee in Ciba's Basel, Switzerland office, Koziel testified that this document reports that "a fully functional version of the synthetic *Bt* gene has been obtained." He testified that the document notes:

> [a] comparison of our synthetic gene with the Monsanto modified gene as published in [*Proceedings of the National Academy of Sciences* (Apr.1991) ] shows we have more severely altered the *Bt* gene than did they. They changed about 21% of the bases while we changed about 35%. Their gene is 79% homologous to the native gene while ours is 65% homologous.

Koziel testified that this document contains a codon-by-codon comparison of the Monsanto and Event 176 genes. Koziel referred to an undated letter he wrote to Dr. Elaine A. Mackey of the University of Zurich. He testified that this letter confirms that he used the most preferred codons in maize based on Murray's codon usage table in designing the coding sequence for the Event 176 gene.

### 2. *Novartis' Case–in–Chief*

Novartis denies that its corn products infringe the claims of the '365 patent, and argues that the claims of the '365 patent are invalid. Novartis argued that its Event 176 gene is so far changed from the principle of the invention claimed in the '365 patent that it does not infringe the patent's claims under the reverse doctrine of equivalents. Novartis argued that the claims of the '365 patent are invalid due to prior invention, because Kenneth Barton and Michael Miller, two scientists working at Agracetus, Inc., invented the subject matter of the '365 patent and reduced it to practice before Monsanto did. Novartis

also argued that the claims of the '365 patent are invalid because of lack of an adequate written description, indefiniteness and obviousness.

Novartis called Dr. Stephen V. Evola, the head of Novartis Seeds biotechnology research. According to Evola, he had been involved in the development of Event 176 corn from its very beginnings in 1986 through its market introduction in 1995. Evola testified that Novartis currently markets the Event 176 corn products under the general term "Maximizer" and the "Knockout" trademark.

Evola testified that in mid–1986, his and his colleagues' highest priority became achieving insect resistance in corn products. In late 1986, Evola and his colleagues put together a research plan to include: testing the native *Bt* genes they had made for tobacco in corn plants; and isolating promoters from corn plants. He testified that they successfully inserted the native *Bt* genes made for tobacco into corn plants, however, the *Bt* protein failed to express adequately. They detected only low levels of *Bt*.

Evola testified that Koziel joined his team in late 1988 to focus on the expression problem. Evola hoped Koziel could pinpoint what was not working in the native *Bt* gene sequence. According to Evola, Koziel suggested building a gene for corn because corn has a preference for G and C codons as opposed to A and T codons. Evola testified that Koziel selected the codons most frequently used by corn without changing the *Bt* protein sequence. He testified that Koziel had to make further modifications to lessen the number of G and C codons in certain regions for technical reasons.

Referring to pages from Koziel's laboratory notebook, Evola testified that Koziel produced a computer printout of the coding sequence he designed on August 22, 1989. He pasted this printout into his notebook on September 11, 1989. Evola testified that they had synthesized Koziel's

sequence by March 1991. They added promoters and terminators around the sequence and then used vectors to shuttle the synthesized gene into a corn cell. Evola referred to their synthesized gene as the maize optimized *Bt* gene. Evola testified that the maize optimized *Bt* gene consisted of 65% G and C codons, whereas the native *Bt* gene had 37% G and C codons. In all, Koziel made 669 changes from the native *Bt* sequence. This resulted in 85% of the codons being changed.

Evola testified that this success resulted in U.S. Patent No. 5, 625,136 entitled "Synthetic DNA Sequence Having Enhanced Insecticidal Activity in Maize," of which he is a co-inventor. According to Evola, he and his colleagues knew of Monsanto's work in the synthetic gene area and compared the sequences of their corn gene with Monsanto's. They included this information in Figure 5 of the '136 patent. Evola testified that they obtained information on Monsanto's synthetic gene from a publication by Perlak and others. *See* Perlak *et al.*, "Modification of the Coding Sequence Enhances Plant Expression of Insect Control Protein Genes," *Proc. Nat'l Acad. Sci.*, 88:3324–3328 (Apr.1991).

According to Evola, Monsanto's gene differs from the Event 176 gene because the Event 176 gene contains the most preferred maize codons which are "highly rich" in G and C codons. Monsanto's approach, on the other hand, used plant preferred codons to include both dicots and monocots. Maize is a monocot. According to Evola, dicots are less GC-rich than corn. Evola testified that the Novartis *Bt* 11 gene is the same gene as Monsanto's synthetic gene. As such, it differs from the Event 176 gene in that it has a different structural coding sequence, different promoters and a different insertion site in the corn's DNA.

Evola testified that by May 1991, Ciba had a synthetic gene that worked in corn plant cells. In October 1991, Ciba started its first transformation experiment leading to *Bt* protein-producing corn plants. According to Evola, by April 1992, Ciba had six corn plants, about six to twelve inches tall, successfully killing European corn borer larvae. By the summer of 1992, Ciba successfully field tested corn seeds in the nation's corn belt, exposing the plants to corn borer larvae infestation. In February 1993, Evola and his colleagues published the results of their field test. *See* Evola *et al.*, "Field Performance of Elite Transgenic Maize Plants Expressing an Insecticidal Protein Derived from *Bacillus Thuringiensis*," *Biotechnology* (Feb.1993).

According to Evola, after obtaining successful field test results, Ciba scientists introduced the *Bt* gene from these plants into other elite corn inbreeds. He referred to this as a back-crossing process that took "a couple of years" to complete. He testified that it took time for adequate testing to be done to ensure that the commercial corn hybrids containing the *Bt* gene had the proper insect resistance along with all the other desirable hybrid qualities. Evola testified that by 1995, Ciba had insect-resistant corn hybrids ready for commercial introduction. Ciba received the required government regulatory approval in August 1995, which gave it the first *Bt* corn product ever approved and the first ever to sell commercially.

On cross-examination, Evola testified that Koziel built the Event 176 gene for corn based on corn's most frequently-used codons. As a consequence, Koziel changed the GC content in the coding sequence. Evola testified that Perlak also increased the GC content in the coding sequence of Monsanto's synthetic gene. According to Evola, both Ciba's gene and Monsanto's gene had ATTTA and putative polyadenylation signals removed. Evola testified that the Event 176 gene had five changes made to its 240 region. These changes removed AACCAA and AATTAA sequences at the beginning of the 240 region. He testified that Ciba, like Monsanto, put a promoter on the front of its synthetic gene and operably linked it to the coding sequence for the *Bt* protein. Evola testi-

fied that the Event 176 gene, like Monsanto's gene, has a 3' nontranslated region at the end. He testified that the Event 176 and Monsanto genes produce pretty "much the same" insecticidal protein.

On redirect, Evola testified that the Event 176 gene has 23% different nucleotides compared to Monsanto's gene, which has 21% different nucleotides from the native gene.

Novartis played excerpts from the video deposition testimony of Dr. Kenneth Barton. At the time the deposition was taken, Barton was a Monsanto employee. He testified that after completing his postdoctoral work, he started as a scientist with Cetus Madison Corporation which eventually became Agracetus. In 1984, he became senior scientist and then in 1990, Vice President of Research and Development.

Barton testified that while at Agracetus in mid–1987, he began in earnest a project of synthetic sequence replacement in the coding region of the $Bt$ gene. He testified that at that time his research indicated that the nucleotide sequence of the $Bt$ gene was very different from plant genes. Barton testified that he worked with Michael Miller, another Agracetus scientist. According to Barton, they formulated the idea of replacing naturally-occurring codons with plant preferred codons, or codons more frequently used in plants, in the structural coding sequence of the $Bt$ gene. He referred to pages, dated August 26, 1987, from his laboratory notebook, indicating that the purpose of his project "will result in alteration of the coding sequence of the $Bt$ toxin, providing the most efficient codon usage for plant expression."

Barton testified that he worked on a $Bt$ subspecies known as the HD–1 dipel gene. Referring to pages, also dated August 26, 1987, from his laboratory notebook, Barton testified that he and Miller had a firm plan in place to alter codon usage in the $Bt$ gene to stabilize messenger RNA. He testified that this plan involved ordering specific oligonucleotides, known as KB72

through KB77, from his company's Oligonucleotide Synthesis Group. These oligonucleotides would be used as substitutes for the nucleotides of the native $Bt$ gene. Oligonucleotides are short stretches, approximately 15–50 nucleotides long, of single-stranded DNA or RNA that are chemically synthesized. *See, e.g., Genentech, Inc. v. Boehringer Mannheim GmbH,* 47 F.Supp.2d 91, 95 (D.Mass. 1999).

Referring to laboratory notebook pages, also dated August 26, 1987, he testified that he planned on altering the native coding regions of the first 139 amino acids of the $Bt$ gene. Barton's laboratory notebook entries show that Barton made the AMV$Bt$ 2 construct on October 20, 1987. Barton also identified computer printouts of AMV$Bt$ 3 and AMV$Bt$ 4 which included changes in their structural coding sequence. According to Barton, a page from his laboratory notebook, dated November 2, 1987, indicates that he and his colleagues made synthetic sequence changes resulting in the AMV$Bt$ 3 construct. Similarly, Barton's laboratory notebook entries show Barton made the AMV$Bt$ 4 construct on January 15, 1988.

Barton testified that he drafted a portion of the "Quarter Three Report for 1988" which his supervisor, Winston Brill, distributed to various Agracetus representatives. This portion of the report reads: "$Bt$ genes with altered codon usage near the amino terminus designed to mimic frequently-used plant codons provide dramatically-increased levels of $Bt$ gene expression in tobacco transformants 100–fold or greater increase relative to unmodified $Bt$ coding regions." Barton testified that he never heard of the 240 region in reference to $Bt$ genes until after Agracetus had been taken over by Monsanto.

Novartis played excerpts from the videotaped deposition testimony of Michael Miller, an Agracetus scientist who started working for Barton in 1984. Miller testified that from his arrival at Agracetus, "the major project in [Barton's] lab was

trying to get expression of *Bt* in plants with the goal of getting insect-resistant plants." Referring to pages from his laboratory notebooks, Miller testified that entries for August 24, 1987 indicate how he and Barton planned to change sequences for their *Bt* expression work.

Novartis played excerpts from the videotaped deposition testimony of Sandra Cannon, an Agracetus technician who did plant tissue culture work for Barton. Cannon testified that on May 23, 1988, she began a bioassay experiment on transformed tobacco plants in which she placed two tobacco hornworms on tobacco plants known as 2374, 2387 and 2460. Cannon testified that of the two tobacco hornworms initially placed on each of these plants, one hornworm died and one was missing from each plant. Referring to pages from her laboratory notebook, Cannon testified that these pages show she placed a star next to each of these plants indicating they were "potential killers." In these pages, she noted that there were several killer plants, including plants 2374, 2387 and 2460.

According to Cannon, these bioassays were "very subjective" and the stars she made "represented the need to continue testing that plant, that it had been deemed worthy of retesting." Cannon testified that she received no special training to conduct these tests. Cannon's laboratory notebook contains entries from January through September 1988 reflecting her technical work on the transformed plants.

Novartis played excerpts from the videotaped deposition testimony of Dr. Frederick J. Perlak, a Monsanto scientist and co-inventor of the '365 patent. Perlak testified that on September 8, 1987, he made the first entry in his laboratory notebook indicating the coding sequence with changes made to the gene's 240 region. According to Perlak, he began work on this sequence in the spring of 1987. By about the end of 1989, or the first part of 1990, he concluded that the 240 section is very critical and "most important" to *Bt* expression. Referring to a Monsanto memorandum, dated August 23, 1988, Perlak testified that it reported preliminary data from tobacco and tomato plants containing his synthetic genes. He also referred to pages from his laboratory notebook, showing results from insect toxicity assays reported on August 12, 1988. Perlak testified that the purpose of these assays was to determine toxicity of *Btk* genes produced in transformed tobacco and tomato plants.

Novartis played excerpts from the videotaped deposition testimony of Edgar Clifford Lawson, who Monsanto designated to testify on its behalf in these proceedings in response to notice by Mycogen. Referring to a page from a laboratory notebook, Lawson testified that the first gene resulting in a reduction to practice of the '365 patent was pMON 5361, constructed on January 6, 1988. According to Lawson, this gene was first bioassayed on August 5, 1988. Lawson testified that the first document disclosing specific nucleotide changes to the 240 region was a page from Perlak's laboratory notebook dated September 8, 1987.

Novartis played excerpts from the videotaped deposition testimony of Fischhoff. Fischhoff testified that with respect to the teachings of Claim 7 of the '365 patent, "the removal of poly-A sites, especially in AT-rich sequence regions would be the most important goal [of the invention]." Fischhoff testified that using the codon usage table included in the patent, it is possible to remove two polyadenylation sites by introducing other polyadenylation sites into the sequence.

Novartis next called Dr. Julia N. Bailey–Serres. She testified that Fischhoff and Perlak recognized that the native *Bt* gene was AT-rich and "considered that removal or reduction of AT-rich sequences might improve expression." In describing the state of the art at the time of the '365 patent, Bailey–Serres testified that in 1987, four publications, including a paper by Fischhoff and Perlak, discussed insert-

ing a *Bt* gene into plants to make them insect resistant. According to Bailey–Serres, Barton, in his 1987 article, suggested modifying the coding sequence to improve expression. Specifically, Barton noted "[w]e are exploring ... synthetic modifications of the toxin coding sequence." Bailey–Serres testified that Fischhoff and Perlak targeted AT-rich sequences and polyadenylation signals within the sequence.

Bailey–Serres testified that while using plant preferred codons to change a *Bt* gene was obvious in 1987, the actual gene designed would not have been obvious because individual codons would have been selected by the designer. According to Bailey–Serres, Fischhoff and Perlak overcame examiner's objections during the PTO application process because they identified the 240 region of the gene. She testified that the inventors targeted the two polyadenylation sites in this region as one of their goals.

Bailey–Serres testified that a "modified chimeric *Bt* gene," as used in Claim 1 of the '365 patent, existed in the prior art before the '365 patent. Referring to Barton's 1987 article as an example of what existed in the prior art, she testified that Barton's modified chimeric gene had a promoter, known as the 35S, which was from a different organism (a virus) than the coding sequence. She testified that Barton's modified chimeric gene had a 3' non-translated region containing a polyadenylation signal. Like Fischhoff and Perlak, Barton also used a truncated gene.

According to Bailey–Serres, Claim 7 of the '365 patent teaches removal of one or both of the potential polyadenylation signal sequences, AACCAA or AATTAA. However, she testified that removing these sequences by changing the nucleotides could result in additional potential polyadenylation signal sequences being introduced into the gene. She also testified that the claim does not teach how to make the changes without introducing additional potential polyadenylation signal sequences.

Bailey–Serres testified about the chemical composition of the various genes. She testified that Monsanto's synthetic gene has a GC content of about 50%, the Event 176 gene has a GC content of about 65%, and a native *Bt* gene has a GC content of about 37%. Monsanto's synthetic gene has changes made to 356 of 615 codons whereas the Event 176 gene has changes made to 540 of 649 codons. She testified that both the Event 176 and Monsanto genes encode the same *Bt* protein coding sequence.

Bailey–Serres testified that the Barton and Miller gene has changes made to the potential polyadenylation signal sequences described in Claim 7 of the '365 patent. Referring to pages from Miller's laboratory notebook, Bailey–Serres testified that on August 24, 1987, Miller prepared a codon usage table from plant gene sequences and placed it in his notebook. According to Bailey–Serres, Barton and Miller used this codon usage table to make changes to about the first 150 codons of the coding sequence, including the 240 region. Barton and Miller replaced these codons with plant preferred codons. They made three constructs, known as the AMV*Bt* 2, AMV*Bt* 3 and AMV*Bt* 4. Bailey–Serres testified that Barton and Miller's work satisfies Claim 1 and Claim 7 of the '365 patent.

According to Bailey–Serres, by August 26, 1987, Barton and Miller had written down a sequence in their notebooks which contained modifications to the 240 region. They continued to work on synthesizing this gene and inserting it into plants. They synthesized the gene sequentially in that they changed the first 50 codons, then the next 50 codons and then the next 50 codons. They then cloned that product into their AMV*Bt* AS vector and shuttled it into tobacco plants. On May 26, 1988, these transformed plants killed tobacco hornworm larvae.

Bailey–Serres testified that Miller's laboratory notebook shows that in August 1988, he conducted quantitative tests, in-

cluding a western blot assay, on transformed plants containing the AMV*Bt* 3 and AMV*Bt* 4 genes. These tests showed that the *Bt* protein was "demonstrably present" in the plant leaves. According to Bailey–Serres, this Barton and Miller gene met the claim limitations of Claim 1 and Claim 7 of the '365 patent.

Bailey–Serres testified that based on her review of various documents and materials related to this litigation, she did not believe Monsanto realized the importance of the 240 region until February 1990 when Perlak described it in his laboratory notebook. According to Bailey–Serres, Perlak used the same technique of employing a plant preferred codon usage table as Barton. She testified that Perlak's laboratory notebook, dated September 8, 1987, contains the DNA sequence he designed for the synthetic gene. According to Bailey–Serres, this gene was constructed and inserted into plants and shown to kill insects in September 1988. Bailey–Serres testified that in her opinion, Barton and Miller, and not Fischhoff and Perlak, were the first to invent a gene that met the limitations of Claim 1 or Claim 7 of the '365 patent.

On cross-examination, Bailey–Serres testified about Cannon's bioassay testing, as reported in Cannon's laboratory notebooks. Bailey–Serres testified that the laboratory notebooks identified plants containing the native *Bt* gene that were "killers" insofar as they killed tobacco hornworm. According to Bailey–Serres, the fact that plants containing the native *Bt* gene killed the tobacco hornworm had been known in the scientific community. She testified, "it's not surprising . . . that a native [*Bt*] gene does kill tobacco hornworm. That had been shown and was in the literature." She testified that Cannon reported she had six killers during worm feeding 56 on May 26, 1988; three of them were *Bt* 3 or *Bt* 4, numbers 2374, 2387 and 2460; the other three plants contained the native *Bt* gene.

On cross-examination, Bailey–Serres testified that in her opinion, Claim 7 of the '365 patent was obvious in light of the prior art in publications by Hoekama, Vaeck and Barton, all of which are cited in the '365 patent and were presumably known to the patent examiner. *See* Hoekama *et al.*, "Codon Replacement in the PGK1 Gene of *Saccharomyces Cerevisiae:* Experimental Approach to Study the Role of Biased Codon Usage in Gene Expression," *Mol. & Cell. Biology*, (1987) 7:2914–2924; Vaeck *et al.*, "Transgenic Plants Protected from Insect Attack," *Nature*, (1987), 328:33–37; Barton *et al.*, "*Bacillus Thuringiensis* 8–Endotoxin Expressed in Transgenic *Nicotiana Tabacum* Provides Resistance to Lepidopteran Insects," *Plant Physiology*, (1987) 85:1103–1109. She testified, however, that the identification of the 240 region was not obvious in light of the prior art.

On redirect, Bailey–Serres testified that Claim 7 does not provide any information about (1) raising the GC content as a way to improve *Bt* expression; (2) removing polyadenylation sites from the structural coding sequences; or (3) removing the ATTTA sequence.

### 3. *Mycogen's Case–in–Chief*

Mycogen offered evidence that the claims of the '365 patent are invalid by raising several affirmative defenses. Mycogen argued that the claims of the '365 patent are invalid because of obviousness, particularly in light of the work done by Adang and Murray at Agrigenetics. According to Mycogen, if the PTO examiner had known of Adang and Murray's work in designing modified *Bt* genes, then he would not have allowed the '365 patent to issue. Mycogen argued that the claims of the '365 patent are invalid due to lack of an adequate written description, emphasizing that the specification of the '365 patent contains no description of a synthetic *Bt* gene with just one change made to the 240 region as the claims teach. Mycogen also argued that the claims of the '365 patent are invalid due to indefiniteness, lack of

enablement and prior invention by Barton and Miller.

As its first witness, Mycogen called Carl Eibl, Mycogen's president and chief executive. Eibl testified that since its inception in 1983, Mycogen had been researching *Bt* strains to develop insecticidal spray products. According to Eibl, Mycogen purchased Agracetus in December 1992 as part of Mycogen's efforts to get into the retail seed business. He testified that Mycogen purchased Agrigenetics hoping to benefit from (1) Agrigenetics's expertise regarding insertion of *Bt* into plants; and (2) Agrigenetics's ownership of several patents.

Eibl testified that in mid–1993, Ciba and Mycogen entered into a license agreement whereby Ciba offered Mycogen the use of its Event 176 gene for corn and Mycogen offered Ciba the use of its Agrigenetics patents. According to Eibl, the genetic code of the Event 176 gene was made public in 1993 in regulatory filings and in Ciba's European Patent Office application.

Next, Mycogen played excerpts from Perlak's video deposition. Perlak testified that he and Fischhoff participated in drafting the '365 patent. He testified that he removed three potential polyadenylation signal sequences from the 240 region. These three sequences consist of two polyadenylation sequences within the 240 region and one polyadenylation sequence which starts in the 240 region but is not located entirely within it. Perlak testified that to his knowledge, the minimum number of potential polyadenylation signal sequences one can remove from the 240 region has not been determined experimentally.

Mycogen called Dr. Guy A. Cardineau, Mycogen's Director of Technology and Development. Cardineau testified that while at Mycogen, he has been involved in the design, synthesis and construction of various *Bt* genes to include fully-synthetic genes, with or without changes made in the 240 region. According to Cardineau, he made a *Bt* gene which has only one nucleotide change in its 240 region, known as a truncated Cry1A(b) gene. Cardineau testified that this is the same gene described in the '365 patent, in which a single nucleotide change, consisting of changing an A to a G, was made at position 24. He testified that a biotechnology company contracted by Mycogen made this gene using site-directed mutagenesis, as described in Example 1 of the '365 patent.

Cardineau testified that a University of Nebraska laboratory, working under contract for Mycogen, subsequently transformed the gene and returned the transformed plant material to Mycogen. Mycogen then used it for insect bioassays. Cardineau testified that these bioassays consisted of three insects being placed on each small tobacco plant tested. At the end of a five-day period, the plants were evaluated. One third of the plants produced toxic results. Cardineau testified that he and his colleagues also tested plants containing only the native *Bt* gene. He testified that they "saw no dramatic improvement in expression when [they] used the gene with the single modification as compared to the native gene."

Cardineau testified that he also produced another synthetic *Bt* gene, known as the MYC–3006, which did not have any nucleotide changes in its 240 region. He testified that the MYC–3006's polyadenylation sites as well as its upstream element are present and have not been modified. According to Cardineau, the MYC–3006 gene is used to transform cotton plants. He testified that he bioassayed transformed cotton plants containing this gene. The three cotton plants containing the MYC–3006 gene (with no nucleotide changes in its 240 region) tested as having no significant difference in toxicity levels from plants with a synthetic gene, known as the AGM–259. The AGM–259 has three changes to its 240 region to correspond to the changes within Claim 7. Cardineau testified that he concluded that

"when you have fully synthetic genes, changes in the 240 region are absolutely unnecessary to get highly toxic plants."

On cross-examination, Cardineau testified that the MYC–3006 and the AGM–259 genes have different promoters. He also testified that a range of plants containing the AGM–259 gene were tested and compared to the first of the MYC–3006 plants. He testified that he did not select only the most highly toxic MYC–3006 plants to be tested against a randomly-selected group of AGM–259 plants.

Mycogen next called Dr. Michael J. Adang, the *Bt* Group Leader at Agrigenetics from 1984 to 1988 and currently a professor at the University of Georgia. Adang testified that in 1985, he and his colleague, Dr. Elizabeth E. Murray, came up with the idea to modify *Bt* genes to make them more plant-like to solve the problem of low *Bt* expression in plants. He testified that these modifications included removing polyadenylation sites. Adang referred to pages from Murray's laboratory notebook, dated October 22, 1985. He testified that these pages show that he and Murray came up with this idea after conducting various tests, including a northern blot experiment run on *Bt* RNA in tobacco plants. The northern blot experiment depicted RNA from tobacco plants containing the *Bt* gene. According to Adang, the northern blot showed that the *Bt* RNA was truncated or chopped up too much to make *Bt* toxin protein.

Adang testified about a November 6, 1985 draft of an abstract of a paper presented at an April 1986 University of California at Los Angeles symposium. Adang testified that he wrote in this draft, "[i]t appears that for efficient expression of this toxin in tobacco plants, the coding sequence must be modified to eliminate premature termination of transcription." According to Adang, he deliberately deleted this sentence in the version of the abstract eventually published because he did not want this information to become public knowledge.

Referring to several documents from 1985, dated October 30, October 31, and November 8, Adang testified that these all represent computer searches that he conducted on various *Bt* genes to locate polyadenylation sites. He testified that in 1985, he worked on three native *Bt* genes, known as the Whiteley gene, the dipel gene and the AC–73 gene. According to Adang, his November 8, 1985 search result showed that the Whiteley gene has an AATTAA sequence in its 240 region. Similarly, Adang testified that the dipel gene and the AC–73 gene each had one AATTAA sequence in their respective 240 regions.

Adang testified that he did not modify the Whiteley gene, the dipel gene· or the AC–73 gene. Instead, he modified a *Bt* gene known as the *Btt* gene, which he described as a *Bt* gene encoded with a protein that kills beetles. According to Adang, the native *Btt* gene does not have a 240 region; it has three AATTAA sequences which he removed when designing his synthetic *Btt* gene.

Adang testified that he spoke about *Bt* expression in plants at the April 1986 UCLA symposium. Based on his speech, he eventually co-authored a paper in which he: (1) explained his work with native *Bt* genes in tobacco; (2) presented his test results about low *Bt* RNA in plants; and (3) discussed polyadenylation sites in *Bt* genes. *See* Adang *et al.*, "Expression of a *Bacillus Thuringiensis* Insecticidal Crystal Protein Gene in Tobacco Plants," *UCLA Symp. Mol. Cell. Biology*, (1987) 48:345–353.

On cross-examination, Adang testified that he "was the first [person] to describe the construction of a *Bt* gene" for which he filed a U.S. patent application in September 1988. He testified that prior to September 1988, he had no physical gene and no insect resistant plant. He testified that he had no indication whether his synthetic gene could actually kill insects. According to Adang, as of September 1988, it was

obvious that polyadenylation sites should be taken out of *Bt* genes. Adang testified that in his patent application, he referred to an article by C.P. Joshi discussing polyadenylation sequences in genes that are expressed in plants such as AATTAA and AACCAA. *See* C.P. Joshi, "Putative Polyadenylation Signals in Nuclear Genes of Higher Plants: A Compilation and Analysis," *Nucleic Acids Research*, (1987), 15:9627–9640.

On cross-examination, Adang testified that in Murray's laboratory notebook in October 1985, she recorded that *Bt* might have some kind of premature termination signal. He testified that he and Murray discussed S–1 mapping of the RNA to show where transcription terminated. Adang referred to comments from Murray's laboratory notebook, dated October 22, 1985, stating specific sequences may cause problems in *Bt* expression and that these problems might be overcome by site-directed mutagenesis.

On cross-examination, Adang testified that S–1 mapping did not provide him with the results he wanted because it did not show him the specific sites where the RNA was being chopped off prematurely. He testified that in 1985, 1986 and 1987, he searched genes for polyadenylation sequences, however, he never attempted to resynthesize a *Bt* gene by removing any of its polyadenylation sequences.

On cross-examination, Adang testified that during this same time period, he and his colleagues held monthly *Bt* meetings and kept minutes for these meetings. He testified that the *Bt* meeting minutes do not record any comments made by either Murray or him to the effect that removal of polyadenylation sequences would solve the problem of low *Bt* expression. Similarly, Adang testified that the minutes of a consultants' meeting hosted by Agrigenetics in the spring of 1987 make no mention to the effect that removal of polyadenylation sequences would solve the problem of low *Bt* expression. Adang testified that during this time period, he personally did not know the significance of the 240 region. He testified that his synthetic gene, as described in his patent application, did not have a 240 region.

On redirect, Adang testified that he did not finish building his synthetic *Btt* gene before filing his patent application for it. According to Adang, in August 1988, Agrigenetics, his employer, closed while he was in the midst of assembling his various constructs. He testified that he later completed the gene at the University of Georgia.

On redirect, Adang testified that in 1985, he thought the fastest route to solving the problem of low *Bt* expression would be to identify the most problematic sequences in the *Bt* gene and fix only those. Adang testified that he thought building an entirely new gene would be expensive and difficult. He testified that by 1987 and 1988, he realized that it would be easier to rebuild the entire gene and he changed his plans accordingly.

On redirect, Adang testified that in his UCLA symposium speech and subsequently published article, he made it plain that polyadenylation sites cause RNA truncation, and that once one knows that polyadenylation sites are the cause of the problem, the solution is to remove them.

Mycogen called Dr. Joseph O. Falkinham, III, who testified at the claim construction hearing. Falkinham testified at length about genetic engineering principles. According to Falkinham, one of the important ways in which bacteria and plant cells differ is that bacteria, like *Bt*, do not use or read polyadenylation sequences. Plant cells, however, read these sequences as a signal to truncate messenger RNA. Thus, when a native *Bt* gene is inserted into a plant cell, the plant cell reads the *Bt*'s polyadenylation sequences and instead of transcribing a full-length mRNA, the plant cell cuts it prematurely, resulting in a shortened, garbled version.

Falkinham testified that in his opinion, the '365 patent contains no data to support

the proposition that a single change in the 240 region will result in improved *Bt* expression in the transformed plant. He testified that the tests represented in Table IV of the '365 patent lack a sufficient control mechanism. He explained that while Table IV shows toxicity results of modified *Btk* genes inserted into plants, it does not include any results from truncated native *Btk* genes inserted into plants. According to Falkinham, the scientific literature, including articles by Vaeck and Barton, showed that truncated native *Btk* genes produced about the same result as the modified genes of Table IV, *i.e.* 30% tested toxic. *See* Vaeck *et al.*, "Transgenic Plants Protected from Insect Attack," *Nature*, (1987), 328:33–37; Barton *et al.*, "*Bacillus Thuringiensis* 8–Endotoxin Expressed in Transgenic *Nicotiana Tabacum* Provides Resistance to Lepidopteran Insects," *Plant Physiology*, (1987) 85:1103–1109 (showing approximately 25% of the plants with inserted truncated native *Bt* genes were lethal to all larvae within four days). He also testified that Cardineau's tests showed values of between 30% and 32% toxicity.

Falkinham testified that in his opinion, based upon the prior art, it would have been obvious to one of ordinary skill in the art in 1987 to modify a *Bt* gene to increase expression by eliminating AATTAA. As support, he referred to scientific papers describing plant polyadenylation sequences. *See, e.g.,* C.P. Joshi, "Putative Polyadenylation Signals in Nuclear Genes of Higher Plants: A Compilation and Analysis," *Nucleic Acids Research,* (1987), 15:9627–9640. Falkinham testified that in his opinion, the claims of the '365 patent are obvious in view of the prior art.

Falkinham testified about the written description requirement. In Falkinham's opinion, the specification of the '365 patent does not contain a written description of the claimed invention with just one change made to the 240 region. He testified that such a gene is not disclosed nor described anywhere in the patent.

Falkinham testified as to the enablement requirement. In Falkinham's opinion, the description of the invention of the '365 patent is not sufficiently clear and exact to enable one of ordinary skill in the art to make and use the full scope of the claim in the invention without undue experimentation. He testified that Claim 1 and Claim 7 do not instruct one skilled in the art how to make a gene with just one change in the 240 region.

Falkinham testified about infringement issues. According to Falkinham, the designers of the Novartis Event 176 gene did not use the principle of the claims of the '365 patent, nor were they guided by the idea of making changes in the 240 region.

As for the data in Table IV, Falkinham testified that the specification acknowledges that "[e]xpression of the wild type truncated gene in tobacco is very poor."

Falkinham addressed questions about obviousness on cross-examination. He testified that the PTO was aware of all of the publications he referred to in support of his opinion that the invention of the '365 patent is obvious.

### 4. *Monsanto's Response*

In its response, Monsanto relied primarily on the testimony of Perlak and Fischhoff to show how these Monsanto inventors were the first to invent the subject matter at issue in this case.

Monsanto called Dr. Frederick J. Perlak, a Monsanto scientist since 1981 and co-inventor of the '365 patent. Perlak testified that his "benchmark achievement" at Monsanto was isolating a *Bt* gene, known as the Cry1AB gene, which has the same protein sequence that is currently found in Monsanto's commercial corn products. (Cry1AB is the acronym for crystalline insecticidal protein, Group 1, Subgroup A and B.)

According to Perlak, his expertise focused on cloning and isolating genes while Fischhoff's expertise involved inserting

them into plants. Perlak testified that initially, they inserted the full-length, native *Bt* gene into tobacco plants. This, however, resulted in low expression. He testified that they next inserted a truncated native *Bt* gene, about half the size of the full-length native gene, into tobacco and tomato plants in 1983 and 1984. Although they produced transformed plants that could kill insects, the level of toxicity was still too low for commercial applications.

Perlak testified about a memorandum prepared by Fischhoff on October 30, 1986 and pasted into Fischhoff s laboratory notebook on December 12, 1986. According to Perlak, this memorandum represents a summary of the different ideas he and Fischhoff had for solving the problem of low *Bt* expression in plants. Perlak testified the memorandum identifies "AT-rich regions" in the *Bt* gene sequence as destabilizing regions, specifically referring to the sequence ATTTA.

Perlak testified that this memorandum lists two approaches to solving the problem of getting increased *Bt* expression in plants. The first approach involves identifying and modifying the most deleterious AT-rich regions of the gene sequence because these regions cause instability in plant cells. The second approach involves looking at the entire gene sequence and creating a synthetic gene. As explained in the memorandum, "[e]xtension of this strategy to total synthesis of *Btk* toxin gene, a predetermined sequence in base composition is also possible."

Perlak testified that in 1987, he and Fischhoff began working on these two approaches for increasing *Bt* expression. Perlak testified that based on this memorandum, he designed three genes, one known as the 5370, which was a partially-modified gene made following the first approach; and the other two, the 5377 and 5383 genes, which were fully-modified synthetic genes made following the second approach. Perlak testified that both the 5370 and 5377 genes are Cry1AB type

genes. The 5383 gene is a related but different gene, known commonly as the cotton gene because of its use in commercial cotton products. According to Perlak, he began designing the 5377 gene in October 1986.

Referring to several Monsanto documents, Perlak testified that they show how he and Fischhoff screened DNA sequences for the presence of polyadenylation sequences. According to Perlak, Fischhoff compiled one of these documents "in the September–October 1986 time frame," which identifies polyadenylation sequences and refers to publications describing polyadenylation sequences. These publications include: Wickens, M. and Stephenson, P., "Role of the Conserved AAUAAA Sequence: Four AAUAAA Point Mutants Prevent Messenger RNA 3' End Formation," *Science* (Nov.1984) 226:1045–1051; and Dean *et al.*, "mRNA Transcripts of Several Plant Genes are Polyadenylated at Multiple Sites *in Vivo*," *Nucleic Acids Research* (1986) 2229–2240. Perlak testified that Fischhoff's memorandum shows that their plan "was to identify polyadenylation signal sequences and remove them. [To][i]dentify disruptive AT-rich sequences, such as ATTTA and remove them and [to] increase GC content."

Perlak testified that these articles by Wickens, Stephenson and Dean identify the sequences, AATTAA and AACCAA. According to Perlak, a computer printout titled, "Potential Polyadenylation Sites in *Btk* Gene in pMON9711," originated by Fischhoff, identifies AATTAA and AACCAA sequences in the 240 region.

Perlak testified about a document, dated March 23, 1987 which he prepared. According to Perlak, this document is a computer printout, or map, of a Cry1AB gene's entire DNA sequence, consisting of all 3,471 base or nucleotide pairs. The map follows from Fischhoff's September–October 1986 memorandum identifying polyadenylation sequences. Perlak testified that he made yellow highlights on this

document in 1987 to show A and T nucleotides. He also put brackets around potential polyadenylation sites. He testified that he marked in yellow highlighter the 240 region, to denote AT-richness. He testified that the highlighting also denotes two potential polyadenylation sequences which he identified, drawing on the published literature on polyadenylation sequences by Wickens, Stephenson and Dean. Perlak testified that he identified the polyadenylation sequences on the map of the *Bt* gene because he wanted to remove them from the gene.

According to Perlak, the 36 nucleotide segment described in Claim 7 of the '365 patent appears on his March 1987 document at line 241. Perlak testified about screening DNA sequences in Fischoff's memorandum. Perlak testified that Fischoff's memorandum shows that he and Fischhoff planned to remove polyadenylation sequences and target specific regions of the gene. According to Perlak, the computer printout is "a visualization of where [the] polyadenylation sites are located on the gene, targeting them for change."

Perlak testified about how he decided to change certain codons while keeping the amino acids the same. He testified that he took care not to change one polyadenylation sequence into another one because that would be counterproductive. He testified that at the same time, he tried to decrease AT-richness and increase GC-richness which in some cases, left him with few choices as to how he could modify the gene.

Perlak testified that he and Fischhoff also planned to take the back part of an HD–73 gene, also known as the Cry1AC gene, and fit it on to the front end of the Cry1AB gene.

Perlak testified about his efforts making the 5370, 5377 and 5383 genes. From March 23, 1987, he and his colleagues performed additional computer searches and analyses, and started preparing vectors and genes for insertion into plants. According to Perlak, he used Monsanto's February 15, 1984 codon usage table, prepared by Steve Rogers, to make changes either to a portion of a gene sequence, or to an entire gene sequence.

Perlak testified that he spent the summer of 1987 designing a synthetic gene on the computer. Referring to pages from his laboratory notebook, Perlak testified that he sent the 5370 gene to be synthesized by a company in Great Britain. Referring to pages from his notebook, he testified that the synthetic gene arrived on February 26, 1988. Perlak testified that he and his colleagues finished the 5370 gene in February 1988, the 5377 gene in March 1988 and the 5383 gene in April–May 1988. Perlak testified that a September 4, 1987 computer printout from his laboratory notebook contains the *Btk* synthetic sequence for the 5377 gene.

Perlak testified that he took tubes of bacteria containing the synthetic *Bt* gene to Monsanto employees, Jean Layton, Toni Armstrong and Nancy Mathis. They archived the strains and inserted the bacteria into plant tissue to start the transformation process. According to Perlak, once the transformed plants grew, Roy Fuchs, a *Monsanto* scientist, tested them for expression. Perlak testified that Fuchs's tests showed high *Bt* expression in the transformed plants. He referred to pages from Fuchs's laboratory notebook, dated August 10, 1988, where Fuchs recorded this high expression. Perlak testified that these genes are represented in the '365 patent. For example, Figure 2–A is 5370 and Figure 3–A is 5377.

On cross-examination, Perlak testified that the limitation of Claim 7 not taught in prior art references concerns modifying the 240 region, "[w]here said structural coding sequence comprises modifications so that at least said region contains at least one fewer sequence elected from the group consisting of an AACCAA and an AATTAA sequence." He testified that he had "definitive data for the 240 region

giving extraordinary expression" in "1989, beginning of 1990."

On cross-examination, Perlak testified that he did not put a copy of his March 23, 1987 document in his laboratory notebook. Perlak testified that his first document showing a modified sequence in the 240 region is dated September 4, 1987 and the first document he entered into his notebook showing a modified sequence in the 240 region is dated September 8, 1987.

Referring to his March 23, 1987 printout, Perlak testified that the 240 region itself is not distinguished by any markings. He testified that he used this document for the 5370 which is a modified gene, not a synthetic gene. He testified that on November 2, 1987, he ordered oligonucleotides to change the 240 region from Tom Rogers, a Monsanto scientist in charge of oligonucleotide production.

Monsanto next called Dr. Roy Fuchs, Monsanto's scientist who tested Perlak's Bt genes in August 1988. Fuchs testified that in 1988, he was a biochemist on the Insect Control Team. In August 1988, his responsibilities included determining whether plants containing the synthetic Bt gene actually expressed the gene. Referring to pages from his laboratory notebook, Fuchs testified that in August 1988, he tested four constructs containing the synthetic Bt gene. These constructs included: pMON 5361; 5370, containing the HD–1 gene with modified codons and an enhanced 35S promoter; 5377 which was the synthetic HD–1 gene; and 5383 which was the synthetic HD–73 gene. Referring to pages from his laboratory notebook, Fuchs testified that his test results consisted of a western blot and ELISA tests. Fuchs testified that they showed that the synthetic genes with plant preferred codons for both the HD–1 and the HD–73 genes express better than the same genes with wild-type or natural codons. He testified that throughout August 1988, he conducted additional tests on various transformed plants, including tobacco, tomato

and cotton. These test results showed these same genes expressed well.

Monsanto next called Dr. Harry Klee, a professor at the University of Florida and a former Monsanto scientist who shared work space with Perlak while Perlak worked on the Bt gene. Klee testified that in the late 1986 to early 1987 time frame, Perlak mentioned one specific region of the gene that he believed was much more important than other regions. Klee testified that he realizes now that Perlak was referring to the 240 region.

Monsanto's next witness was Dr. Linda Hanley–Bowdoin, a former Monsanto postdoctoral associate who shared office space with Perlak for one year. Hanley–Bowdoin testified that when she began working at Monsanto in April 1987, she knew Perlak had an ongoing project to attempt to increase plant Bt expression by changing certain DNA sequences. Hanley–Bowdoin testified that Perlak worked on Bt sequence analysis in 1987. In particular, he highlighted in yellow on various computer printouts those sequences he thought might be causing problems in the gene. She testified she observed Perlak using Monsanto's codon usage table which was taped onto a bookcase in their shared office.

Monsanto next called Dr. Thomas Rogers, a Monsanto scientist. He testified that during 1986 and 1987, he was the leader of a research group that had responsibility for all of Monsanto's oligonucleotide synthesis. According to Rogers, from September 24, 1987 until November 2, 1987, Perlak submitted various requests to synthesize various sequences for his work with the Btk gene. On cross-examination, he identified a document, dated November 2, 1987, titled "BtK 240.REQ," as a request from Perlak to synthesize an oligonucleotide from the 240 region of the Bt gene.

Toni Armstrong, a Monsanto employee, testified that in early 1988, she worked as a research biologist doing cotton transformation using genes designed by Perlak.

Referring to pages from her laboratory notebook, she testified that on April 12, 1988, she inoculated the 5377 synthetic gene construct, also known as pMON 5377, into cotton. On May 17, 1988, she inoculated the 5388 synthetic gene construct into cotton. She testified these inoculations were successful because the plants produced new genetic material.

Jeanne G. Layton, a Monsanto employee, testified that in 1988, she was a research biologist doing tomato transformation using genes designed by Perlak. Referring to pages from her laboratory notebook, she testified that in March 1988, she conducted successful experiments involving four of Perlak's *Bt* genes. She testified that these experiments produced plants containing the *Bt* constructs. Layton also testified that she witnessed the laboratory notebooks of Nancy Mathis, a former Monsanto employee who did tobacco transformation, using genes designed by Perlak. Referring to pages from Mathis's laboratory notebook, she testified that by March 1988, Mathis had started several transformation experiments and grew plants containing the *Bt* constructs.

Dr. David Fischhoff, the co-inventor of the '365 patent, testified for Monsanto. He testified that when he began working at Monsanto in 1983, his job was to take the native *Bt* gene which Perlak had isolated and engineer it so it could be inserted it into plants. These native *Bt* gene experiments resulted in low *Bt* expression. He testified that he and Perlak next experimented with inserting truncated native *Bt* genes into plants but again, these experiments resulted in low *Bt* expression. Referring to a September 22, 1986 monthly summary report he prepared, Fischhoff testified that the report shows that he and Perlak realized that to enhance expression, the level of stable RNA had to be increased. He testified that he and Perlak suspected that polyadenylation sites in the *Bt* gene "were one of the reasons we were getting so little *Bt* RNA."

Fischhoff testified that a September 22, 1986 computer file shows a listing of polyadenylation sequences he used to search the *Bt* gene for their presence. According to Fischhoff, he compiled his list of polyadenylation sequences by researching the published literature related to plant and animal cells. He believes he is the first person to compile such a comprehensive list.

Referring to an October 30, 1986 memorandum he prepared, Fischhoff testified that in October 1986, he and Perlak had a strategy "to identify and then remove certain types of sequences in the *Bt* gene that included regions that were AT-rich, poly-A [polyadenylation] sites, and certain other sequences that we listed, like the sequence ATTA." These would be replaced by plant preferred codons. He testified they considered both site-directed mutagenesis and chemical synthesis of the entire gene to accomplish these changes.

Fischhoff testified that in October 1986, he and Perlak were the first to come up with the idea that AT-rich sequences and polyadenylation sequences existed and should be removed. He testified that on December 12, 1986, he pasted into his notebook his October 1986 memorandum containing this idea. According to Fischhoff, from October 1986 until the early part of 1987, he conducted computer searches to locate these sequences in the *Bt* gene and to identify their exact position.

Fischhoff testified that in 1986 and 1987, he and Perlak used Monsanto's codon usage table prepared by Steve Rogers to substitute plant preferred codons for the "bad" sequences they wanted removed from the *Bt* gene. He testified that they used this table for their work on the 5370, 5377 and 5380 genes.

Fischhoff testified that as early as the end of 1986, he and Perlak realized the 240 region of the *Bt* gene needed to be changed because they observed two overlapping polyadenylation sequences in this region. During 1987 and 1988, they

worked on designing the 5370, 5377 and 5383 genes.

According to Fischhoff, in the spring of 1988, Monsanto initiated a program to take the synthetic genes that he and Perlak designed and put them into plant vectors. The vectors would then deliver the synthetic genes into corn cells. For example, he referred to pages from his laboratory notebook, dated April 11, 1988, detailing an experiment he ran to insert Bt genes into corn. He testified that by late 1988 or early 1989, Monsanto had successfully made whole regenerated corn plants with Fischhoff and Perlak's synthetic gene. He testified that the 5377 is the same gene as the gene in the Novartis Bt 11 corn product.

Fischhoff testified that the Bt gene made with changes to the 240 region alone gives "a very remarkable and substantial difference in expression of the Bt gene in plants." He testified that other researchers confirmed this finding, referring to a publication by van der Salm. See van der Salm et al., "Insect Resistance of Transgenic Plants that Express Modified Bacillus Thuringiensis Cry1A(b) and Cry1C Genes: A Resistance Management Strategy," Plant Molecular Biology, (1994) 26:51–59.

On cross-examination, Fischhoff testified that Monsanto's Ezra gene differs from the 5377 gene in that researchers used a monocot codon table to design it. He testified that Novartis was the only company that inserted the 5377 gene into corn and commercialized the resulting product, under license from Monsanto. He testified that although Monsanto inserted the 5377 into corn plants, it did not commercialize the product.

On cross-examination, referring to the October 30, 1986 memorandum, Fischhoff testified that this document does not use the term, "plant preferred codon," and makes no reference to a plant codon usage table.

On cross-examination, Fischhoff testified that as of August 1988, he and Perlak had no data from plants with inserted Bt genes with changes made only to the 240 region. According to Fischhoff, he and Perlak had data pertaining to the "nine hot spots of the gene" which confirmed that changes to these nine places would increase expression greatly. He testified that these nine hot spots include the 240 region.

On cross-examination, Fischhoff testified that he and Perlak did not test a gene that had only one of the polyadenylation sequences from its 240 region removed. He testified that he is not aware of any data that would indicate that just one change to the 240 region would give improved expression. According to Fischhoff, he remembers participating in a meeting with the PTO examiner during the prosecution of the '365 patent during which he informed the examiner that the 240 region "had a profound effect on Bt expression in plants." Fischhoff testified that in correspondence with the PTO, Monsanto identified this region as the "result effective region." Fischhoff testified that Table IV of the '365 patent shows data from transformed plants. He testified that this data shows increased Bt expression in plants containing Bt genes with changes made to the 240 region.

Monsanto recalled Dr. Nam Hai Chua as part of its response. Chua testified about Cardineau's tests of synthetic genes made with only one modification to the 240 region. According to Chua, Cardineau's tests were not well-designed, in part, because the tests did not measure how well the transformed plants could kill insects. Specifically, Chua testified that Cardineau only placed one tobacco hornworm on the plants he tested rather than several hornworms. This meant that Cardineau's test could not determine the effectiveness of the insect-resistant transformed plants.

### 5. Jury Verdict

On June 30, 1998, the jury returned its verdict. The jury found that defendants' products, including Mycogen NatureGard

Corn Products and Novartis Maximizer Corn Products, literally infringe the four asserted claims (Claims 7, 8, 9 and 12) of the '365 patent. Although finding literal infringement, the jury found that defendants' products are so far changed from the principle of the invention claimed in the '365 patent that they do not infringe any of the four asserted claims under the reverse doctrine of equivalents.

As for prior invention, the jury found that the four asserted claims of the '365 patent are invalid because Barton and Miller invented, while at Agracetus, Inc., the claimed subject matter before Fischhoff and Perlak did, while at Monsanto. The jury found that defendants had not proven that the asserted claims of the '365 patent are invalid for lack of enablement, lack of adequate written description, indefiniteness or obviousness.

### 6. Post–Trial Motions

The parties all move for judgment as a matter of law ("JMOL"), pursuant to Federal Rule of Civil Procedure 50. Monsanto moves for JMOL contending that (1) there is no legally sufficient evidentiary basis for a reasonable jury to find that Monsanto's asserted patent claims are invalid due to prior invention; and (2) there is no legally sufficient evidentiary basis for a reasonable jury to find that the defendants' products do not infringe the asserted claims under the reverse doctrine of equivalents. In the alternative, Monsanto moves for a new trial under Federal Rule of Civil Procedure 59(a) on the issue of non-infringement under the reverse doctrine of equivalents.

Novartis moves for JMOL contending that (1) the only reasonable conclusion is that the asserted claims of the '365 patent are invalid for lack of an adequate written description; (2) the only reasonable conclusion is that the asserted claims of the '365 patent are invalid for indefiniteness; and (3) the only reasonable conclusion is that the asserted claims of the '365 patent are invalid as obvious.

Similarly, Mycogen moves for JMOL contending that (1) the only reasonable conclusion is that the asserted claims of the '365 patent are invalid for lack of an adequate written description; and (2) the only reasonable conclusion is that the asserted claims of the '365 patent are invalid for indefiniteness. In the alternative, Mycogen moves for a new trial under Federal Rule of Civil Procedure 59(a) with respect to these two issues.

The parties have also filed post-trial briefs on the defendants' motion for a declaratory judgment of unenforceability of the '365 patent due to Monsanto's alleged failure to disclose material information to the PTO during prosecution of the '365 patent.

### F. Factual Background Relevant to Monsanto's Alleged Inequitable Conduct

■■ Defendants have counterclaimed for a declaratory judgment that the '365 patent is unenforceable because of Monsanto's alleged inequitable conduct before the PTO. A patent applicant has a duty to disclose material information to the PTO during patent prosecution. "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability ...." 37 C.F.R. § 1.56(a) (1996). If the applicant breaches this duty with the intent to mislead or deceive the PTO, the court may find that conduct renders the patent unenforceable. See, e.g., Kingsdown Medical Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 872 (Fed.Cir.1988).

Defendants assert that Monsanto breached its duty of disclosure by intentionally failing to disclose material information to the PTO during prosecution of the '365 patent. Specifically, defendants assert that Dennis Hoerner, Esquire, a Monsanto patent attorney, and David

Fischhoff intentionally failed to disclose to the PTO material information they had acquired prior to the issuance of the '365 patent in March 1996. This material information related to the Barton and Miller application owned by Agracetus.

Defendants assert that prior to March 1996, Hoerner and Fischhoff knew the Barton and Miller application existed and knew that it had overlapping claims with the '365 patent application. Defendants assert that Hoerner and Fischhoff learned that the Barton and Miller application had overlapping claims with the '365 patent based on information in Monsanto's possession. This information includes: (1) a copy of the abstract of the Barton and Miller application; (2) a report prepared by Monsanto's outside counsel, David Parker, concerning certain Agracetus intellectual property, including the Barton and Miller application; and (3) the fact that the Barton and Miller application had an August 1989 priority date.

Defendants assert that Hoerner and Fischhoff intentionally failed to disclose this information to the PTO because they knew that if the patent examiner knew of the Barton and Miller application, he would have declared an interference between it and the '365 patent application. Defendants assert that Hoerner and Fischhoff knew an interference would have resulted in the '365 patent not being issued.

Thus, the court must determine what, if any, information Hoerner and Fischhoff had prior to March 1996 about the Barton and Miller application, whether this constitutes material information, whether Hoerner and Fischhoff appreciated it as such, and whether Hoerner and Fischhoff intentionally failed to disclose it to the PTO.

The court finds the following.

On February 24, 1989, Monsanto filed the application that resulted in the '365 patent. Hoerner prepared this application. On August 7, 1989, Agracetus filed the Barton and Miller patent application which described a modified chimeric gene that expresses insecticidal levels of *Bt* protein in transformed plants. On October 29, 1991, Monsanto filed an information disclosure statement related to its prosecution of the '365 patent application. This statement disclosed: (1) Adang's European Patent Office application, noting that it "describes a synthetic *Bacillus thuringiensis* toxin gene" and (2) Barton's 1987 article published in *Plant Physiology,* noting that it describes his work with "insect resistant tobacco by expression of *Bt* endotoxin." Barton *et al., "Bacillus Thuringiensis* 8–Endotoxin Expressed in Transgenic *Nicotiana Tabacum* Provides Resistance to Lepidopteran Insects," *Plant Physiology,* (1987) 85:1103–1109 ("The Barton 1987 article").

In early 1991, Monsanto entered into negotiations with Agracetus for the purpose of licensing certain Agracetus patent rights including patent rights that would issue from the Barton and Miller application, the Whiteley *Bt* gene and Agracetus's U.S. patent for cotton *Agrobacterium* transformation. On February 1, 1991, Dr. John F. Hebblethwaite, a Monsanto employee negotiating this license agreement with Agracetus, requested a copy of the abstract of the Barton and Miller application. On February 4, 1991, Agracetus sent him a copy. This abstract reads, in its entirety:

> A method for improving the expression of genes in plants making use of a pattern of codon usage discerned for native plant genes which express preferentially. The coding sequence of the gene for the *Bacillus thuringiensis* delta endotoxin crystal protein was analyzed and found to have codons not preferred by plants. By constructing a synthetic protein coding sequence including codons which are preferred in plant genes, expression of the protein in plant cells was improved.

A year after Hebblethwaite's request, on February 17, 1992, Monsanto and Agracetus signed an option agreement which al-

lowed Monsanto's outside counsel, as part of Monsanto's due diligence, to inspect the Barton and Miller application, the Whiteley *Bt* gene and the U.S. patent for cotton *Agrobacterium* transformation. The option agreement provided that Monsanto would execute the license agreement if it was satisfied with the results of the due diligence. David Parker, Esquire, a partner in the law firm of Arnold, White and Durkee, performed this due diligence inspection and submitted a written report to Hoerner ("The Parker report").

In a February 20, 1992 letter from Agracetus's counsel, Nicholas J. Seay, Esquire, to Parker, Agracetus imposed certain conditions and constraints on what Parker could report to Monsanto. Agracetus required that Parker "agree absolutely to maintain any information in confidence which reveals or suggests dates of invention or reduction to practice" for any of the Agracetus patent applications he was to inspect. Agracetus also required Parker to "maintain in confidence all information contained in the Agracetus patent documents, even from Monsanto, except to the extent necessary for you to give an opinion to Monsanto as to the likelihood of issuance of any of the Agracetus patent applications, and as to the likely scope of the claims which might issue from these applications."

During his due diligence, Parker had access to the file history of the Barton and Miller application. He wrote his report, dated March 25, 1992, and sent it to Hoerner.

During the course of this litigation, defendants moved to compel Monsanto to produce the Parker report. On May 19, 1998, the court denied this motion but directed Monsanto to disclose any underlying facts contained in the Parker report. *See Upjohn Co. v. U.S.*, 449 U.S. 383, 395–396, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts...."). *See also Fed.R.Evid.* 501.

In interrogatory responses, dated June 12, 1998, Monsanto disclosed the underlying facts contained in the Parker report. In its responses, Monsanto stated it learned from the Parker report that the Barton and Miller application: (1) "disclosed and claimed a synthetic *Bt* gene;" (2) "contained insect toxicity tests;" (3) "contained claims directed to transgenic dicot plants comprising a *Bt* gene with a coding region including a synthesized 5' region which contained plant preferred codons;" (4) "contained claims directed to transgenic dicot plants comprising a *Bt* gene with a coding region including a synthesized 5' region of between 25 and 132 codons constructed from nucleotide sequences selected from those codons determined to be efficiently expressed in plants;" (5) contained "a summary of rejections of the Barton and Miller application made by the PTO examiner in the first, second and third PTO actions;" and (6) contained an affidavit submitted to the PTO by Agracetus in which Agracetus swore its invention was completed before the filing date of a prior art reference cited by the examiner.

Also in these interrogatory responses, Monsanto stated it "had no knowledge concerning the actual changes made in the nucleotide sequence" of the *Bt* gene.

On April 8, 1992, shortly after receiving the Parker report, Monsanto and Agracetus executed a non-exclusive license agreement pertaining to certain patent rights held by both parties. Section 1.5 of the agreement detailed the parties' respective interests:

> Monsanto desires a license from Agracetus to make, use and sell genetically engineered plants which might otherwise be an infringement of Agracetus Patent Rights ... and Agracetus desires an option to license Monsanto technology to make, use and sell plants incorporating *Bt* genes ... made by Monsanto.

The agreement defined "Agracetus Patent Rights" as its patent rights in three

pending patent applications. These were the Barton and Miller application, the Whiteley *Bt* gene application (Ser. No. 646, 690 and 517,193) and the U.S. patent application for cotton *Agrobacterium* transformation (Ser. No. 299,767).

Under the terms of the agreement, Monsanto agreed to pay Agracetus $1 million up front, of which $500,000 was for a non-exclusive license for the patent rights to the Barton and Miller application and the Whiteley *Bt* gene application. In addition, Monsanto agreed to pay royalties for its use of the Agracetus technology. These royalty payments were to be calculated based on formulae set out in the agreement. Although the parties entered into this license agreement, they also agreed that Monsanto would not be permitted to see the Barton and Miller application.

On April 22, 1992, Monsanto filed an amendment to the '365 patent application, adding a claim which required specific changes in the 240 region of the *Bt* gene and a claim which required changes in the 5' end of the *Bt* gene. At this time, Hoerner turned over prosecution of the '365 patent application to Lawrence M. Lavin, Jr., Esquire, a Monsanto patent attorney. Hoerner's and Lavin's names both appear as attorneys of record on the '365 patent. In his November 4, 1997 deposition, Lavin testified that he did not know about the Barton and Miller application while he was prosecuting the '355 application.

In 1995, W.R. Grace, the parent corporation that owned Agracetus, put Agracetus up for sale. In 1996, Monsanto decided to make a bid to purchase Agracetus. In connection with Monsanto's bid, Hoerner participated in a due diligence investigation of Agracetus on March 21–22, 1996. During this investigation, Hoerner saw the Barton and Miller application. On April 8, 1996, Monsanto purchased Agracetus.

On November 7, 1996, the PTO declared a three way interference, known as Patent Interference No. 103, 781, among (1) a Monsanto patent application (Serial No. 08/434, 105), which descended from the '365 patent application; (2) the Barton and Miller application; and (3) Mycogen's '831 patent. Monsanto responded to the PTO's declaration of interference by giving the PTO notice on November 21, 1996 that it had common ownership of the Barton and Miller application In this correspondence, Monsanto requested that the Barton and Miller application remain in the interference, in light of the interference's common subject matter of "the design, synthesis and expression of genes in plants." The PTO, however, excluded the Barton and Miller application from the interference because its practice is that an interference should not be continued between applications owned by a single party. *See* 37 C.F.R. § 1.602(a) (1996).

The parties do not dispute that during the pendency of the '355 application, Monsanto never disclosed information about the Barton and Miller application to the PTO.

Mycogen argues that Fischhoff knew about the invention claimed in the Barton and Miller application prior to March 1996 based on his knowledge of the abstract to the Barton and Miller application and scientific publications. In support, Mycogen called Dr. Lawrence Bogorad, an emeritus professor of biology at Harvard University who specializes in gene expression in plants. He testified that Fischhoff, as one skilled in the art, would have known from reviewing the Barton 1987 article that Barton's gene was a *Btk* HD–1 dipel gene obtained from Dr. Whiteley. He testified that a nucleotide sequence of the *Btk* HD–1 dipel gene, consisting of 1176 amino acids, had been published in the scientific literature. *See* H.E. Schnepf, H.C. Wong, H.R. Whiteley, "The Amino Acid Sequence of a Crystal Protein from *Bacillus Thuringiensis* Deduced from the DNA Base Sequence," *Journal of Biological Chemistry*, (1985) 260:264–6272. Bogorad testified that Barton's gene was a truncated *Bt* gene, consisting of 645 amino acids, and

that the Barton gene's 240 region was located in the first 141 codons at the amino terminal end that Barton modified.

Bogorad testified that in 1992, one skilled in the art presented with the abstract of the Barton and Miller patent application would be able to discern that Barton's gene had a 240 region because the abstract is consistent with and follows from Barton's earlier publications. According to Bogorad, design of Barton's synthetic gene would involve replacing as many codons as possible with plant preferred codons so long as the same amino acid was retained. Bogorad testified that this design would necessarily involve changes to the 240 region. He testified that Barton and Miller made many of the same changes to codons as Fischhoff and Perlak because both pairs of inventors used the same approach of avoiding A and T nucleotides.

On cross-examination, Bogorad testified that although Barton refers to the "general notion" of a plant preferred codon usage table in his publications, Fischhoff and Perlak did not have access to the same codon usage table employed by Barton when they made changes to their Monsanto gene. Bogorad also testified that in 1992, Fischhoff and Perlak did "not necessarily" know what kind of a codon usage table Barton employed.

Mycogen next called Fischhoff. He testified that as a Monsanto Group Leader II, he interfaced with Hoerner and Hebblethwaite. According to Fischhoff, part of his duties at Monsanto consisted of keeping abreast of the publicly-available information in areas related to his research. This included reading European patents and scientific literature.

Fischhoff testified that Barton's truncated gene contained a 240 region consisting of 36 nucleotides, which is identical to his and Perlak's gene. Counsel asked Fischhoff if he recalled reading a scientific article Barton wrote in 1991 discussing Barton's *Bt* gene. B.H. McCown *et al.*, [including Barton], "Stable Transforma-

tion of *Populus* and Incorporation of Pest Resistance by Electric Particle Acceleration," *Plant Cell Reports*, (1991) 9:590–594 ("The Barton 1991 article"). According to Fischhoff, at the time he read this article, he did not realize that the 240 region was within the first 141 codons of the Barton *Bt* gene. He testified that in 1991, he sent a copy of the Barton 1991 article to Perlak along with a short handwritten note for informational purposes. The note stated: "This Agracetus paper contains some info on their synthetic gene."

Counsel asked Fischhoff about a scientific article Barton wrote in 1993. Barton & Miller, "Production of *Bacillus Thuringiensis* Insecticidal Proteins in Plants," *in Transgenic Plants*, (1993) 297–315 ("The Barton 1993 article"). Fischhoff testified that he sent Hoerner a copy of the article, on which he wrote a note, dated January 20, 1993. The note instructs Hoerner to "[s]ee pages 309–310 for Barton's current version of what they did." On page 310 of the Barton 1993 article, Barton makes note of a report by Perlak published in 1990. In the article, Barton commented that Perlak's report "describes a gene reconstruction similar to our own." *See* Barton & Miller, "Production of *Bacillus Thuringiensis* Insecticidal Proteins in Plants," *in Transgenic Plants*, (1993) 310 (citing Perlak *et al.*, *BioTechnology* 8:939–943 (1990)).

Fischhoff testified that he participated in a due diligence project in connection with Monsanto's acquisition of Agracetus in 1996. According to Fischhoff, during the course of that work, he did not realize that Barton and Miller had filed a patent application. Fischhoff testified that "the first time" he "might have suspected" that Barton was listed as an inventor on an application regarding the expression of *Bt* genes in plants "would have been in the mid–1990s." He testified that he never saw the abstract of the Barton and Miller application until this trial.

Fischhoff testified about a December 6, 1991 presentation paper entitled "*Bt* Cot-

ton NPC Review," prepared by Hebblethwaite. Hebblethwaite's presentation paper lists Fischhoff as a member of the *"Bt* Cotton Commercial Team." On a page titled "Freedom to Operate/Product Introduction Strategy," the paper states the following:

Execute a License with Agracetus in the Event of:

● Interference with Their HD–1 Truncated

● Overlapping Claims with the Truncated HD1 Gene Modifications

● Need to Use Their Cotton Transformation Plant

Next to the second bullet beginning "Overlapping Claims," Fischhoff wrote in parentheses, "protection in case this issues."

On a page titled "Potential Patent Estates," the paper lists:

Truncated *Bt* Genes

● Lubrizol Genetics, Inc., %4 U.S. Priority

● Agracetus, Inc. %4 U.S. Priority

Modified Truncated *Bt* Genes

● Agracetus, Inc.—8/89 U.S. Priority

Under the "Truncated *Bt* Genes" Agracetus subcategory, Fischhoff wrote "HD1–Cry1AA" and "Monsanto, %4 U.S. Priority, HD1–Cry1AB."

Next to the "Modified Truncated *Bt* Genes" %9 U.S. Priority subcategory, Fischhoff wrote "1st ⅓ of trunc[ated] gene codon usage change."

Fischhoff testified that he could not "remember what these notes refer to." He testified that he did not know if the notes referred to what was communicated to him about an Agracetus patent application or a Barton article discussing changes in the first 141 codons. When questioned about the Hebblethwaite presentation paper, he testified that he knew Barton was working with an HD1–Cry1AA gene in 1991 and that he "might have been aware" of the Barton and Miller application in 1991.

Counsel asked Fischhoff about statements made by Hebblethwaite during his February 1998 deposition testimony. In his deposition, Hebblethwaite testified that at the time he wrote his presentation paper, he was negotiating the licensing agreement with Agracetus. Hebblethwaite testified that he "was sure David [Fischhoff] was involved in meetings associated" with potential interferences in the areas of modified and synthetic *Bt* genes. Fischhoff testified that he did not recall attending these meetings or being "involved in" these meetings.

Fischhoff testified that during 1991 and 1992, he worked as a member of a Monsanto innovation team and did not work directly on *Bt* issues. He testified that in 1992, he moved to the plant biotechnology group where he did very little work with *Bt*. He testified that he was not aware of the contents of the Barton and Miller application or its abstract during the prosecution of the '355 application. Fischhoff also testified that he was not aware of the claims of the Barton and Miller application during the time the '355 application was pending before the PTO.

In his December 17, 1997 deposition, Hoerner testified that the '365 patent application "was pursuing claims directed to removal of certain inimical sequences." He testified that the abstract to the Barton and Miller application makes no reference to that topic. According to Hoerner, "in the Monsanto [application] case, the use of what was characterized as plant preferred codons was not the thrust of the work." He testified that based on the abstract of the Barton and Miller application, one cannot conclude that there is "overlapping subject matter."

He testified that he first saw the file history of the Barton and Miller application in late March 1996, during a due diligence assignment related to Monsanto's purchase of Agracetus, after the '365 patent had issued. He testified that he has "not perused the sequence that's in the Barton and Miller application to determine

how it overlays with respect to the subject claims."

Hoerner testified that he "had no information that would indicate to us that there was any disclosure in that [Barton and Miller] application that dealt with a modified 240 region in the manner ... claimed in the '365 patent." He testified that it was his opinion that none of the information he had concerning the Barton and Miller application "was sufficient alone or, in combination to bring one to the conclusion, that the Barton and Miller work had any connection to what was being claimed in the '365 patent."

In his February 1998 deposition, Hebblethwaite testified that he had consulted with Hoerner "in gathering information for his patent review" of December 6, 1991. Hebblethwaite testified that Hoerner provided him with the information that Agracetus's U.S. priority date for modified truncated *Bt* genes was August 1989 and that "he discussed [priority] dates" with Hoerner. Hebblethwaite also testified that he consulted with Hoerner when he presented information on "overlapping claims with their truncated HD–1 gene modifications" and that he consulted Hoerner about interferences although he did not recall "specific interferences."

## II. DISCUSSION

The court now addresses the parties' post-trial motions.

A. *Should the Court Grant Judgment as a Matter of Law?*

1. *What is the Standard for Granting Judgment as a Matter of Law?*

Federal Rule of Civil Procedure 50(a) provides that the court may determine an issue against a party where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Fed.R.Civ.P.* 50(a). *See also Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir.1995), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d

1049 (1996) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict").

█ The court may grant JMOL in favor of a party bearing the burden of proof only where (1) the movant "has established [its] case by evidence that the jury would not be at liberty to disbelieve;" and (2) "the only reasonable conclusion is in [the movant's] favor." *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed.Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998) (citations omitted). *See also* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2535, at 325–328 (3d ed.1995) (noting courts often caution that granting JMOL for party bearing burden of proof is "reserved for extreme cases" and motion for JMOL granted less frequently for party bearing burden of proof than it is for opposing party).

█ The court must consider all the evidence and draw all reasonable inferences from the evidence in the light most favorable to the non-movant. *Richardson–Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997); *Gomez*, 71 F.3d at 1083; *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691 (3d Cir. 1993); *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). The court may not determine the credibility of witnesses and it may not "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin–Elmer*, 732 F.2d at 893; *Joy Technologies, Inc. v. Flakt, Inc.*, 820 F.Supp. 802, 805 (D.Del.1993), *aff'd*, 60 F.3d 843 (Fed.Cir.1995). Rather, the court must determine "whether the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." *GNB Battery Technologies, Inc. v. Exide Corp.*, 876 F.Supp. 582, 597 (D.Del.1995), *aff'd*, 78 F.3d 605 (Fed.Cir. 1996).

2. *Should the Court Grant Monsanto's motion for JMOL that the Asserted Claims of the '365 Patent Are Invalid by Prior Invention?*

■ Monsanto has moved for JMOL that the jury acted unreasonably in finding that Claims 7, 8, 9 and 12 of the '365 patent are invalid by prior invention. Here, the court considers whether there is legally sufficient evidence to support a reasonable jury's finding that Claims 7, 8, 9 and 12 of the '365 patent are invalid by prior invention in light of the work of Barton and Miller did while they were at Agracetus.

a. *What is the applicable legal standard for establishing that the claims of a patent are invalid by prior invention?*

■ A person is entitled to a patent unless "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). As the Federal Circuit has explained, "[p]riority goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Price v. Symsek,* 988 F.2d 1187, 1190 (Fed.Cir. 1993) (footnote and citations omitted).

■ Conception is the formation in the inventor's mind of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice. *See Cooper v. Goldfarb,* 154 F.3d 1321, 1327 (Fed.Cir.1998); *Coleman v. Dines,* 754 F.2d 353, 359 (Fed.Cir.1985). The inventor must prove conception by corroborating evidence.

■ An actual reduction to practice occurs when the inventor: (1) constructs a product that is within the scope of the claimed invention, and (2) demonstrates that his invention actually worked for its intended purpose. *Scott v. Finney,* 34 F.3d 1058, 1062–63 (Fed.Cir.1994). *See*

*also Cooper v. Goldfarb,* 154 F.3d at 1327; *Estee Lauder Inc. v. L'Oreal S.A.,* 129 F.3d 588, 593 (Fed.Cir.1997); *UMC Elecs. Co. v. United States,* 816 F.2d 647, 652 (Fed.Cir.1987).

■ Where a party is the first to conceive the invention but reduces it to practice after another party's reduction to practice, the party that was the first to conceive the invention will be the first inventor if he can show reasonable diligence during the time from a date just prior to the conception date of the other party until the party that was the first to conceive the invention reduces it to practice. *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1577–1578 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 119 S.Ct. 874, 142 L.Ed.2d 775 (1999). Courts refer to this time period as the "critical period." *Id.*

■ The Federal Circuit defines diligence as reasonably continuous activity toward reduction to practice so that the invention's conception and reduction to practice are substantially one continuous act. *Id.* at 1577. Diligence must be considered in light of all the circumstances and the question to answer is whether the inventor was pursuing his goal in a reasonably continuous fashion. *Id.*

To summarize, when two inventors claim to have invented the same subject matter, priority of invention goes to the first inventor to reduce the invention to practice, unless the other inventor can show that he was the first to conceive the invention and that he exercised reasonable diligence in later reducing that invention to practice.

In the present case, the jury found that defendants have shown by clear and convincing evidence that Claims 7, 8, 9 and 12 of the '365 patent are invalid because Barton and Miller invented the claimed subject matter before Fischhoff and Perlak did. Accordingly, the jury's finding of prior invention by Barton and Miller must be upheld if there is legally sufficient evidence for a reasonable jury to find that: (1) Barton and Miller were the first to

reduce the invention to practice; or (2) Barton and Miller were the first to conceive of the invention, and then exercised reasonable diligence in later reducing that invention to practice.

As follows, the court determines whether there is legally sufficient evidence to support the jury's findings.

### b. *What is the invention of the '365 patent?*

As a threshold issue, Barton and Miller's invention must be for the same or substantially the same subject matter of the invention of the '365 patent. *See, e.g., Cooper v. Goldfarb,* 154 F.3d at 1327; *Scott v. Finney,* 34 F.3d at 1062–63; *see also In re Dardick,* 496 F.2d 1234, 1238 (CCPA 1974). While Monsanto does not dispute that the Barton and Miller application is the same as or substantially the same as the subject matter of the invention of the '365 patent, the court will still address this issue in order to fully understand the issue in dispute. Accordingly, the court begins by examining the invention of the '365 patent.

Based on the testimony of Chua, Fischhoff, Bailey–Serres, Perlak and Rogers, as well as the file history and text of the '365 patent, the evidence shows that the invention of the '365 patent is a modified chimeric gene that significantly improves the expression of insecticidal *Bt* proteins in transformed plants. The invention does this by replacing certain naturally-occurring nucleotide sequences in the 240 region that discourage *Bt* protein expression with more favorable plant preferred nucleotide sequences.

To summarize this evidence, Chua and Bailey–Serres testified that Monsanto represented to the PTO that changes in the 240 region gave dramatic improvement in *Bt* protein expression. In correspondence with the PTO, Monsanto represented that changes to the 240 region made dramatic improvement in *Bt* expression. Perlak testified about how he identified and replaced certain naturally-occurring nucleo-

tide sequences in the 240 region, such as the polyadenylation sequences, while keeping the amino acids the same.

Similarly, based on the testimony of Barton, Miller and Bailey–Serres, the record shows that the invention described in the Barton and Miller patent application is a modified chimeric gene that significantly improves the expression of insecticidal *Bt* proteins in transformed plants. It does this by replacing certain naturally-occurring nucleotide sequences that discourage *Bt* protein expression with more favorable plant preferred nucleotide sequences.

While the record shows that neither Barton nor Miller realized the importance of the 240 region or used that term to describe it, their invention nonetheless made changes to it. For example, Barton testified that he planned to replace the native codons of the first 139 amino acids of the *Bt* gene with plant preferred codons, as recorded in his notebook on August 26, 1987. These amino acids included the 240 region. Bailey–Serres explained how Barton and Miller's gene had changes made to its 240 region. Barton's laboratory notebooks also referred to other modifications of the 240 region. Based upon this testimony, the court finds there is legally sufficient evidence for a reasonable jury to find that both Barton and Miller's invention and the invention of the '365 patent are modified chimeric genes, with changes made to their respective 240 regions, that significantly improve the expression of insecticidal *Bt* proteins in transformed plants. Accordingly, the court finds that there is legally sufficient evidence for a reasonable jury to find that Barton and Miller's invention covers substantially the same subject matter as the '365 patent's invention.

### c. *Could a reasonable jury find that Barton and Miller were the first to reduce their invention to practice?*

To establish an actual reduction to practice, the inventor must demonstrate that his or her invention actually worked for its intended purpose. *Scott v. Finney,*

34 F.3d at 1062–1063. The court must first determine whether there is legally sufficient evidence upon which to base a finding that Barton and Miller were the first to reduce their invention to practice. To do this, the court first examines the evidence concerning whether Barton and Miller demonstrated that their invention worked for the intended purpose of the '365 patent.

### i. *What is the intended purpose of the invention of the '365 patent?*

■ To determine an invention's intended purpose, the court need not focus solely on the patent's claims. *See, e.g., DSL Dynamic Sciences Ltd. v. Union Switch & Signal, Inc.,* 928 F.2d 1122, 1124 (Fed.Cir.1991). The court finds that the '365 patent's "Statement of Invention" best describes the invention's intended purpose. It reads: "The present invention provides a method for preparing synthetic plant genes which genes express their protein product at levels significantly higher than the wild-type [native] genes which were commonly employed in plant transformation hereto." Column 7, Lines 30–36. The "Statement of Invention" also acknowledges that "expression of *Bt* genes in plants is problematic" and that "expression of *Bt* genes in plants at insecticidal levels" while "reported" has not been "straightforward." The "Statement of Invention" also makes repeated references to "insecticidal levels," "insecticidal plants," "insecticidal effect," and "insecticidal efficacy." The court finds that the "Statement of Invention" makes it clear that the intended purpose of the invention was to get *Bt* expression at insecticidal levels where ultimately the invention would have commercial appeal.

### ii. *Did the Barton and Miller invention work for the intended purpose of the '365 patent?*

As stated above, Monsanto does not dispute that the Barton and Miller invention is the same as or substantially the same as the subject matter of the invention of the '365 patent. Rather, Monsanto argues that there is no legally sufficient evidentiary basis for a reasonable jury to find that Barton and Miller reduced their invention to practice. According to Monsanto, the bioassays done by Agracetus's Cannon in May 1988, by placing tobacco hornworms on transformed tobacco plants, cannot prove reduction to practice since these bioassays did not establish that Barton and Miller's gene "expressed protein at a higher level than the native gene." According to Monsanto, Cannon's tobacco hornworm toxicity tests are not sufficient to establish that the Barton and Miller gene worked for its intended purpose because these bioassays "do not distinguish native *Bt* genes." Monsanto argues Cannon's bioassays cannot be accepted as a reduction to practice "because the invention was a *Bt* gene that worked better than the native gene" and defendants have conceded that the native *Bt* gene also kills tobacco hornworms in transformed tobacco plants. Monsanto argues that Barton and Miller's invention could not be reduced to practice "until quantitative tests were done to prove the expression of enhanced levels of the *Bt* protein," and the parties do not dispute that Monsanto conducted these quantitative tests first.

■ The Federal Circuit recognizes that "[d]epending on the character of the invention and the problem it solves, determining that the invention will work for its intended purpose may require testing." *Cooper v. Goldfarb,* 154 F.3d at 1327; *Mahurkar v. C.R. Bard Inc.,* 79 F.3d at 1578. "When testing is necessary, the embodiment relied upon as evidence of priority must actually work for its intended purpose." *Cooper v. Goldfarb,* 154 F.3d at 1327.

The Federal Circuit has provided guidance for the trial court to consider in cases where testing may be necessary to determine whether the invention works for its intended purpose. First, the testing requirement depends on the particular facts

of each case, with the court guided by a common sense approach to determine the sufficiency of the testing. Second, reduction to practice does not require that the invention, when tested, be commercially-ready. Third, testing does not need to show utility beyond a possibility of failure, but only utility beyond a probability of failure. *Scott v. Finney,* 34 F.3d at 1062–63 (citations omitted). The Federal Circuit has described its common sense approach as prescribing "more scrupulous testing under circumstances approaching actual use conditions when the problem includes many uncertainties." *Id.* at 1062. However, "when the problem to be solved does not present myriad variables, common sense similarly permits little or no testing to show the soundness of the principles of operation of the invention." *Id.*

The court now considers the testing performed on the invention described in the Barton and Miller patent application. Cannon described her May 23, 1988 bioassay tests as "very subjective." In these tests, she placed two tobacco hornworms each on three transformed tobacco plants. She reported that three hornworms died and three were missing. Tobacco hornworms are extremely sensitive to *Bt* compared to other insects. For example, the '365 patent notes "hornworm is up to 500 fold more sensitive to *Bt* toxin than some agronomically important insect pests...." Column 8, lines 23–28. Also, it had been established that tobacco plants transformed with the native *Bt* gene could kill tobacco hornworms. For example, the '365 patent notes "[i]t has been reported that the full length gene from *Btk* HD–73 gave some insecticidal effect in tobacco," citing to Adang. *See* Adang *et al.,* "Expression of a *Bacillus Thuringiensis* Insecticidal Crystal Protein Gene in Tobacco Plants," *UCLA Symp. Mol. Cell. Biology,* (1987) 48:345–353. The court finds that since tobacco plants transformed with the native *Bt* gene could kill tobacco hornworms, Cannon's experiments did not necessarily show that Barton and Miller's gene worked better than the native gene.

The '365 patent's invention involved overcoming a complex problem of genetic engineering and plant molecular biology that includes many uncertainties and left the inventors precious little room for error. For such a case, the Federal Circuit teaches that Cannon's bioassays do not fall within the category of scrupulous testing. Based on the particular facts of this case, the common sense approach advocated by the Federal Circuit teaches that something more than Cannon's bioassay tests, identifying three dead tobacco hornworms, is needed to prove actual reduction to practice.

Accordingly, for the reasons stated above, the court finds that Cannon's tobacco hornworm bioassays do not show that Barton and Miller's modified gene expressed *Bt* pesticidal protein at significantly improved levels compared to the native *Bt* gene. Thus, Cannon's tobacco hornworm bioassays in and of themselves do not show that Barton and Miller's invention actually worked for the intended purpose of the '365 invention. Barton and Miller did not demonstrate that their invention worked for the intended purpose of the '365 invention until Miller conducted quantitative tests, including a western blot, later in August 1988. These tests showed that their modified gene expressed *Bt* pesticidal protein at significantly improved levels compared to the native *Bt* gene.

Accordingly, the court concludes that there is not legally sufficient evidence for a reasonable jury to find that Barton and Miller reduced their invention to practice before Fischhoff and Perlak.

d. *Could a reasonable jury to find that Barton and Miller were the first to conceive of the invention, and then exercised reasonable diligence in later reducing the invention to practice?*

The court has determined that the evidence in the record is insufficient to support a jury verdict based on a finding that Barton and Miller were the first to reduce the invention to practice. The court next

examines whether there is legally sufficient evidence for a reasonable jury to find that Barton and Miller were the first to conceive of the invention, and then exercised reasonable diligence in later reducing that invention to practice.

### i. Could a reasonable jury find that Barton and Miller conceived of the invention first?

 Whether an inventor has exercised reasonable diligence must be determined by the particular circumstances of each case. *Rines v. Morgan,* 45 C.C.P.A. 743, 250 F.2d 365, 369 (CCPA 1957). For example, an inventor does not have to "drop all other work and concentrate on the particular invention involved." *Gould v. Schawlow,* 53 C.C.P.A. 1403, 363 F.2d 908, 921 (CCPA 1966).

Monsanto argues that the evidence admitted at trial is not legally sufficient for a reasonable jury to find that Barton and Miller exercised reasonable diligence. Monsanto argues the evidence is insufficient because the record contains substantial, unexplained gaps during the time period when Barton and Miller should have been exercising reasonable diligence.

The record shows that Fischhoff and Perlak wrote out their gene sequence during September 4–8, 1987. The record also shows that Barton and Miller conceived their invention prior to September 8, 1987. For example, referring to his laboratory notebook, Barton testified that on August 26, 1987, he recorded the plan he and Miller devised to alter codon usage in the *Bt* gene to stabilize mRNA. He also testified about his plans to order specific oligonucleotides to use as substitutes for the nucleotides of the native *Bt* gene. Hence, the time period for which diligence must be shown is just prior to September 8, 1987 until mid-August 1988, when Barton and Miller succeeded in reducing their invention to practice. The evidence shows Barton and Miller reduced their invention to practice then because Miller confirmed

the positive results of the tobacco hornworm bioassay tests by conducting western blot tests. These tests showed that Barton and Miller's modified gene expressed *Bt* protein product at significantly improved levels compared to the native *Bt* gene.

The parties correctly agree that Barton and Miller are the first inventors if they conceived of their invention before September 8, 1987, and exercised reasonable diligence in reducing that invention to practice from a time just before September 8, 1987 until mid-August 1988. *See, e.g., Mahurkar v. C.R. Bard, Inc.,* 79 F.3d at 1577–78.

### ii. Could a reasonable jury find that Barton and Miller exercise reasonable diligence in reducing their invention to practice?

If there was legally sufficient evidence admitted at trial for a reasonable jury to find that Barton and Miller exercised reasonable diligence in reducing their invention to practice in mid-August 1988, then a reasonable jury could find that Barton and Miller established prior invention. *See id.* at 1577.

Miller testified as follows concerning their diligence:

Q: Between August 24, 1987 and this insect bioassay worm feeding 56 [in May 1988], did Ken Barton or you or someone under the supervision of Ken Barton or you make reasonable efforts toward obtaining transformed plants expressing *Bt* 4?

A: Yes, we did.

Such generalized statements do not satisfy diligence requirements. *See Naber v. Cricchi,* 567 F.2d 382, 386 (CCPA 1977).

During the period from just before September 8, 1987 until mid-August 1988, significant dates and evidence of diligence, drawn from the laboratory notebooks of Agracetus personnel, include:

| | |
|---|---|
| October 20, 1987 | AMV*Bt* 2 construct made by Barton. |
| November 2, 1987 | AMV*Bt* 3 construct made by Barton. |
| January 15, 1988 | AMV*Bt* 4 construct made by Barton. |
| Mid–January 1988 | Transformation experiments conducted by Cannon. |
| May 23–26, 1988 | Tobacco hornworm bioassays conducted by Cannon. |
| June 3, 1988 | Cannon enters data in her laboratory notebook. |
| June & July 1988 | Additional bioassays conducted by Cannon. |
| August 11, 1988 | Western blot tests conducted by Miller. |

The record also shows that from August 1987 until January 1988, Barton worked on construction of the AMV*Bt* 2, AMV*Bt* 3 and AMV*Bt* 4 plasmids. During this period, his laboratory notebook shows numerous entries reflecting his work constructing and optimizing the plasmids for use in plants. For example, he made entries in each of the following months: August, September, October, November and December 1987 and January 1988.

Additionally, the record shows that from mid-January 1988 until May 1988, Cannon worked on growing the plant cultures in her charge and testing for *Bt* expression. During this period, her laboratory notebook shows numerous entries reflecting her technical work made in each of the following months: January, February, March, April and May 1988. Barton also testified that he drafted part of a report for the third quarter of 1988 summarizing his and Miller's invention.

The court finds that there is a legally sufficient evidentiary basis for a reasonable jury to find that Barton and Miller were the first to conceive of the invention, and then exercised reasonable diligence in reducing that invention to practice. Accordingly, the court finds that there is legally sufficient evidence to support the jury's finding that Claims 7, 8, 9 and 12 of the '365 patent are invalid by prior invention. The court will therefore deny Monsanto's motion for JMOL on this issue.

3. *Should the Court Grant Monsanto's Motion for JMOL that the Reverse Doctrine of Equivalents is Not Applicable?*

■ Monsanto has moved for JMOL that there is not a legally sufficient evidentiary basis for a reasonable jury to find non-infringement under the reverse doctrine of equivalents. Specifically, Monsanto argues that the defendants did not show that the "Event 176 gene is so far changed in principle that it performs the function of the '365 patent claims in a substantially different way." Here, the court addresses whether there is legally sufficient evidence to support the jury's finding that the defendants' activities do not infringe the '365 patent due to the reverse doctrine of equivalents.

a. *What is the applicable legal standard?*

Courts have long recognized non-infringement under the reverse doctrine of equivalents. *See, e.g., Westinghouse v. Boyden Power–Brake Co.,* 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136 (1898).

Although long-recognized as a defense to infringement, the reverse doctrine of equivalents is rarely offered as a defense. According to the Federal Circuit, "because products on which patent claims are readable word for word often are in fact the same, perform the same function in the same way, and achieve the same result, as the claimed invention, a defense based on the reverse doctrine of equivalents is rarely offered." *SRI Int'l v. Matsushita Electric Corp. of America,* 775 F.2d 1107, 1123, n. 19 (Fed.Cir.1985). *See also Chisum on Patents* § 18.04[4][a], 18–391–399 (1999).

■ The United States Supreme Court teaches that "where a device is so far

changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The court's jury instruction on the reverse doctrine of equivalents echoed this guidance: "[i]n order for the doctrine to apply to an accused product, you must find that the product is so changed from the principle of the claimed invention that it would be unfair to find infringement." The court continued: "[i]n order to make this determination, you must focus on the principle of the contribution made by the inventors of the '365 patent and compare that principle to the accused product." *See, e.g., SRI Int'l*, 775 F.2d at 1122.

b. *What is the principle of the contribution made by the inventors of the '365 patent and the Event 176 gene?*

The Federal Circuit teaches that the court must examine the principle of the contribution made by the inventors of the '365 patent and then compare that principle to the accused product, the Event 176 gene. *Id.* The record shows that Monsanto identified the 240 region as a "result effective region" during its proceedings with the PTO. The court has set out Monsanto's actions in this regard in detail in the claim construction part of the opinion. Two examples drawn from the prosecution history of the '365 patent are briefly repeated here. First, referring to a Monsanto response to an office action, dated April 26, 1995, Fischhoff testified that he recalled Monsanto making the following argument to the patent examiner:

> any change created which includes among the changes a change in the specific region identified by Claim[s] 43 [from which Claim 1 of the '365 patent derived] and 51 [from which Claim 7 of

the '365 patent derived] will have dramatically improved expression of the *Bt* gene and 43 and 51 identify the 240 region.

Second, in its April 26, 1995 response, Monsanto notes that "[t]hese claims are directed to the discovery by applicants of a result effective region [referring to the 240 region] of *Bt* genes that when modified to remove the occurrence of certain sequences, can improve the expression of the *Bt* gene in plant cells dramatically." This response also distinguished Monsanto's invention from a potential prior art reference on the ground that "Adang *et al.* (1995) does not distinguish any region of the *Bt* gene from any other region of the *Bt* gene. Adang *et al.* (1995) teaches that any change is result effective. In view of Adang *et al.* (1995), applicant's teachings that some changes have little effect where as other changes have a great effect is clearly surprising."

At trial, Chua, Monsanto's expert, confirmed that: (1) Monsanto represented to the PTO that changes in the gene's 240 region gave dramatic improvement in expression; (2) Claim 7 directs particular significance to the 240 region; and (3) Monsanto represented to the PTO that the 240 region was important for patentability of Claim 7. Bailey–Serres, Novartis's expert, corroborated these points in her testimony, noting that Fischhoff and Perlak overcame examiner's objections because they identified the 240 region.

As the 240 region is the result effective region of the gene, the asserted claims of the '365 patent require modifications consisting of at least one certain specified change (removal of either AACCAA or AATTAA) in the 240 region. The claims, however, permit additional modifications within the 240 region and elsewhere, as confirmed by the testimony of Chua and others.

With respect to the Event 176 gene, the Koziel '136 patent's specification notes that its inventors "have optimized the codon usage by using the codons which are most

preferred in maize (maize preferred codons) in the synthesis of the synthetic gene." '136 patent, column 3, lines 4–8. The Event 176 gene has three nucleotide changes made to its 36 nucleotide 240 region to eliminate the AATTAA and AACCAA sequences, which are the same polyadenylation sequences and region claimed by the '365 patent. Falkinham, Novartis's expert, testified that the nucleotide changes in the 240 region of the Event 176 gene would not have been necessary in its construction. Bailey–Serres testified that the Event 176 and Monsanto genes have chemical compositions that are distinct.

The Koziel '136 patent's specification notes that the Event 176 gene is 77% homologous with one of the genes in the 365 patent. As Chua explained, this means that 77% of the nucleotide sequence is identical in the two genes. As he phrased it, "there's a very high sequence identity in these two genes."

The court must examine the principle of the contribution of the '365 patent. The court finds that the principle of the contribution is the removal of at least one of the polyadenylation sequences, AACCAA or AATTAA, in the 240 region's structural coding sequence. This is the principle of the contribution of the '365 patent because removal of one or more of these sequences leads to high levels of *Bt* expression in transformed plants. Monsanto's identification of the 240 region as the gene's "result effective" region in PTO proceedings confirms the court's finding.

The court finds that the principle of the contribution of the Event 176 gene is its use of maize preferred codons throughout the synthesis of the gene to replace naturally-occurring codons. Application of this principle required the inventors of the Event 176 gene to make changes to the 240 region, as well as elsewhere. These changes to the nucleotide sequence fall within the scope of Claims 7, 8, 9 and 12 of the '365 patent. Also, as Chua's and Evola's testimony confirmed, the Event 176 gene, like Monsanto's gene, is a modified chimeric *Bt* gene that has promoters operably linked to the structural coding sequence and its 3' end.

Based upon this evidence, the court finds that there is a legally sufficient evidentiary basis for a reasonable jury to find that the Event 176 gene performs the same function as the invention of the '365 patent and falls within the literal scope of the asserted '365 patent claims.

c. *Is the Event 176 gene so far changed from the principle of Monsanto's invention that it is unfair to find infringement?*

Having set out the principle of the contribution for both Monsanto's gene and the Event 176 gene, the court next addresses the second part of the reverse doctrine of equivalents test: whether the Event 176 gene is so changed from the principle of Monsanto's invention that it is unfair to find infringement. *See SRI Int'l.,* 775 F.2d at 1123.

The record shows that both the Event 176 and Monsanto's genes improve *Bt* expression by generating insecticidal proteins in transformed plants. While the two genes may be chemically distinct and structurally different, both genes generate the same insecticidal protein, confirmed by the testimony of Evola and Bailey–Serres. They generate the same insecticidal proteins by replacing certain nucleotide sequences that interfere with protein expression. The '365 patent teaches that the 240 region must be changed and employed a codon usage table to make these changes. The '136 patent teaches that all regions should be changed using a maize preferred codon usage table. The '365 patent identifies the 240 region as the critical place to make changes because changes there lead to high levels of *Bt* expression in transformed plants.. The teaching of the '136 patent results in changes being made to the 240 region of the Event 176 gene.

Considering all the evidence, the court finds the Event 176 gene is not so far changed in principle from Claims 7, 8, 9

and 12 of the '365 patent because both genes perform the same function in a similar way and achieve the same result. *Id.*

Based upon the evidence admitted at trial, the court concludes there is no legally sufficient evidentiary basis for a reasonable jury to find that the defendants' accused products do not infringe due to the reverse doctrine of equivalents. Accordingly, the court finds the jury acted unreasonably in finding that the defendant's products do not infringe due to the reverse doctrine of equivalents. Therefore, the court will enter judgment as a matter of law for Monsanto on this issue.

4. *Should the Court Grant Defendants' Motion for JMOL that the Asserted Claims of the '365 Patent Are Invalid for Lack of an Adequate Written Description?*

■ The jury found that the asserted claims of the '365 patent are not invalid for lack of an adequate written description. Defendants move for JMOL that, based upon the evidence admitted at trial, the jury's only reasonable conclusion is that the asserted claims of the '365 patent are invalid for lack of an adequate written description. In support of their motion, Mycogen and Novartis argue that Claim 7 of the '365 patent requires that the 240 region be modified to contain one fewer AACCAA or AATTAA polyadenylation sequence. They argue, however, that nothing in the written description discloses or describes removing only one of the 240 region's polyadenylation sequences.

Mycogen argues that because the '365 patent's inventors never considered removing just one polyadenylation sequence from the 240 region, they could provide a written description of what they have not conceived. Mycogen also argues that the only reasonable conclusion for the jury is that the patent examiner never considered whether the specification supports removal of just one polyadenylation sequence from the 240 region.

Here, the court resolves whether the only reasonable conclusion for the jury is that Claims 7, 8, 9 and 12 of the '365 patent are invalid for lack of an adequate written description.

a. *What is the applicable legal standard?*

■ According to 35 U.S.C. § 112, "[a patent's] specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same...." 35 U.S.C. § 112. To satisfy the written description requirement, the patent's specification must describe an invention in sufficient detail so that one skilled in the art can conclude that "the inventor invented the claimed invention." *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1548, 140 L.Ed.2d 695 (1998) (citations omitted). The applicant need not describe the subject matter claimed in exact terms. However, "the description must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *In re Gosteli,* 872 F.2d 1008, 1012 (Fed. Cir.1989) (citations omitted). "If a person of ordinary skill in the art would have understood the inventor to have been in possession of the claimed invention at the time of filing, even if every nuance of the claims is not explicitly described in the specification, then the adequate written description requirement is met." *In re Alton,* 76 F.3d 1168, 1175 (Fed.Cir.1996). *See also Ralston Purina Co. v. Far–Mar–Co, Inc.,* 772 F.2d 1570, 1575 (Fed.Cir. 1985) ("[T]he test for sufficiency of support in a parent application is whether the disclosure of the application relied upon 'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.'") (quoting

*In re Kaslow,* 707 F.2d 1366, 1375 (Fed. Cir.1983)).

█ Under the written description requirement, patent claims may be no broader than the supporting disclosure. A narrow disclosure limits the breadth of the claim. *Johnson Worldwide Associates, Inc. v. Zebco Corp.,* 175 F.3d 985, 992 (Fed.Cir.1999); *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1479 (Fed. Cir.1998).

b. *Is the only reasonable conclusion that the asserted claims of the '365 patent are invalid for lack of an adequate written description?*

As discussed above, the 240 region of the unaltered native *Bt* gene has the following sequence:

TTAATTAACCAAAGAATAGAAGAATTCGCTAGGAAC

1 5 10 15 20 25 30 35

The 240 region contains two polyadenylation sequences, AACCAA (nucleotides 7–12) and AATTAA (nucleotides 3–8). They overlap as follows: AATTAACCAA (nucleotides 3–12). Another AACCAA sequence begins in the 240 region at nucleotide 34 and extends beyond it.

Claim 7 requires that the 240 region be modified to contain "at least one fewer" AACCAA or AATTAA polyadenylation sequence. The claim limitation at issue, "at least one fewer" polyadenylation sequence in the 240 region, was not in any of the claims of the parent application filed on February 24, 1989 nor was it in the continuation-in-part application filed on February 12, 1990. Monsanto introduced it by amendment in January 1993.

Accordingly, the court must examine what in the written description discloses removing only one of these polyadenylation sequences from the 240 region. The specification states:

> In its most rigorous application, the method of the present invention involves the modification of an existing structural sequence ("structural gene") which codes for a particular protein by removal of ATTTA sequences and putative polyadenylation signals by site directed mutagenesis of the DNA comprising the structural gene. It is most preferred that substantially all the polyadenylation signals and ATTTA sequences are re-moved although enhanced expression levels are observed with only partial removal of either of the above sequences.

'365 Patent, column 10, lines 1–10.

Although this passage does not refer solely to the 240 region, it describes "partial removal" of polyadenylation sequences. The passage informs a person of ordinary skill in the art that it is "most preferred" for one to remove "substantially all the polyadenylation signals and ATTTA sequences" from the gene. However, the passage teaches that partial removal of either of the above sequences from the gene is acceptable. The court finds that partial removal, as used in this passage, allows a person of ordinary skill in the art to recognize that the invention encompassed removal of one sequence from the 240 region.

█ As a matter of law, the Federal Circuit teaches that:

> A patent is presumed valid, 35 U.S.C. § 282, and this presumption is based in part on the expertise of patent examiners presumed to have done their job. This presumption, which may be viewed as a presumption of administrative correctness, as applied to a new matter determination was discussed by our predecessor court, which stated that " 'the fact that the Patent Office allows ... an

amendment without objection thereto as new matter ... is entitled to an especially weighty presumption of correctness.'"

*Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1574–75 (Fed. Cir.1992). Thus, an especially weighty presumption of correctness applies when a PTO examiner allows a claim amendment without objecting to it as presenting new matter, or matter outside the description of the specification.

Claim 7 derives from Claim 78 of the application. When presented in patent prosecution, Claim 78 stated that "a region substantially homologous" to the 240 region should be modified so that "at least said region contains at least one fewer sequence selected from the group consisting of an AACCAA and AATTAA sequence." The examiner initially rejected the claim on the grounds that the phrase, "substantially homologous" made it indefinite. The examiner's initial rejection suggests, at a minimum, that the examiner paid attention to the claim's wording. The record does not indicate that the examiner raised any written description issue with respect to that claim. Nor did the examiner raise any objections to the "at least one" language.

Although Monsanto withdrew Claim 1 of the '365 patent as an asserted claim in this case, Claim 1's prosecution history is instructive because Claim 1 contains similar language to Claim 7, "at least one modification in said [240] region" selected from a list of nucleotide replacements. Claim 1 derives from Claim 43 of the application. On July 11, 1992, the examiner rejected Claim 43 as not meeting the written description requirement. At that time, however, Claim 43 required all seven nucleotide modifications in the 240 region listed in the claim, not "at least one." The examiner did not maintain the objection and in a January 25, 1994 office action, the examiner determined that Claim 43 was "free of the prior art and in allowable condition."

Subsequently, on May 25, 1994, Monsanto presented the examiner with several amendments. These included amendments to Claim 43. Instead of requiring all seven modifications in the 240 region, Claim 43, as amended, would cover just one. In the materials it submitted to the PTO, Monsanto delineated the amendment's added language by underlining it and delineated the amendment's deleted language by putting it in parentheses. The examiner subsequently approved the amendment.

The court finds that the prosecution history shows that the PTO examiner, after consideration, allowed the claims that matured into Claim 7 and Claim 1 on two separate occasions. Thus, Monsanto is entitled to an especially weighty presumption of correctness. *See Brooktree Corp.,* 977 F.2d at 1574–1575.

In light of the specification and the prosecution history, the court determines that the patent's specification describes the invention in sufficient detail so that one skilled in the art can clearly conclude that the inventor invented the claimed invention. Accordingly, the court finds that it is not the only reasonable conclusion that Claims 7, 8, 9, and 12 of the '365 patent are invalid for lack of an adequate written description. The court, therefore, denies defendants' motion for JMOL on this issue.

5. *Should the Court Grant Defendants' motion for JMOL that the Asserted Claims of the '365 Patent Are Invalid for Indefiniteness?*

The jury found that the asserted claims of the '365 patent are not invalid for indefiniteness. Defendants move for JMOL that the only reasonable conclusion for the jury to reach is that the asserted claims of the '365 patent are invalid for indefiniteness. In support, defendants argue that the asserted claims are indefinite because while they require removal of at least one AACCAA or AATTAA sequence from the 240 region, they do not teach how these sequences should be removed. De-

fendants further argue that the claims do not teach what nucleotides should be changed or what nucleotides should be used to replace them.

### a. What is the applicable legal standard?

■ The law requires that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. "Whether a claim is invalid for indefiniteness requires a determination whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed.Cir.1986) (citations omitted). "[A]t some point, lack of clarity [in the claims] may result in the conclusion that the claim is too indefinite to be valid." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir. 1998).

■ Enablement and definiteness are separate and distinct requirements. *See Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1453 (Fed.Cir.1988). The enablement requirement focuses on whether the invention was described with sufficient exactness to enable any person skilled in the art to make and use the same. *See Morton Int'l v. Cardinal Chemical Co.*, 5 F.3d 1464, 1469 (Fed.Cir.1993); *Chisum on Patents*, § 8.03[2], 8–21.

### b. Is the only reasonable conclusion that the asserted claims of the '365 patent are invalid for indefiniteness?

Defendants' arguments overlook the fact that the claims of the '365 patent do not have to inform one skilled in the art how to practice the claimed invention. By law, that is the function of the specification and the enablement requirement. The court finds that the issue of how to remove AACCAA or AATTAA from the 240 region goes to the enablement requirement which the defendants do not raise.

Mycogen argues that the word, "modifications," as used in the asserted claims results in indefiniteness. Mycogen directs the court's attention to (1) whether "modifications" as used in the patent's claims include the singular as well as the plural; and (2) if plural, where the second modification should be made in the *Bt* gene.

Mycogen did not raise or contest the meaning of this term during the claim construction hearing. It now tries to raise a claim construction issue under the guise of an indefiniteness defense. To permit Mycogen to raise a claim construction issue under this guise would serve to frustrate a district court's effort to achieve finality in claim construction.

Defendants have not challenged the jury's finding on enablement. Rather, it appears they have tried to recast what are essentially enablement arguments into indefiniteness ones. Based upon the evidence admitted at trial, the court finds that it is not the only reasonable conclusion that the asserted claims of the '365 patent are invalid for indefiniteness. Accordingly, the court denies defendants' motion for JMOL that the asserted claims of the '365 patent are invalid for indefiniteness.

### 6. Should the Court Grant Defendants' Motion for JMOL that the Asserted Claims of the '365 Patent Are Invalid as Obvious?

■ The jury found that the asserted claims of the '365 patent are not invalid as obvious. Defendants argue that the only reasonable conclusion for the jury to reach is that the asserted claims of the '365 patent are invalid as obvious. In support of the motion, Novartis argues that "by 1987, at least three different groups of scientists had published their results of obtaining transgenic plants containing native *Bt* genes that exhibited some toxicity."

### a. What is the applicable legal standard?

■ "A patent may not be obtained . . . if the differences between the subject

192

matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. Four factual inquiries guide the court in its determination of whether a claimed invention satisfies 35 U.S.C. § 103. These factors include: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time when the invention was made; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). *See also Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 989 (Fed.Cir.1988). The fourth factor consists of such evidence "as commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others." *Pro–Mold and Tool Co., Inc.*, 75 F.3d 1568, 1571 (Fed.Cir.1996).

### b. *Is the only reasonable conclusion that the asserted claims of the '365 patent are invalid as obvious?*

■ Contemporaneous development by others skilled in the art is evidence that is probative of the level of skill in the art. *See, e.g., In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed.Cir.1986). Novartis refers to scientific articles by Barton and Hoekama to support its argument. *See* Barton *et al.*, "*Bacillus Thuringiensis* δ-Endotoxin Expressed in Transgenic *Nicotiana Tabacum* Provides Resistance to Lepidopteran Insects," *Plant Physiology*, (1987) 85:1103–1109; Hoekama *et al.*, "Codon Replacement in the PGK1 Gene of *Saccharomyces Cerevisiae:* Experimental Approach to Study the Role of Biased Codon Usage in Gene Expression," *Mol. & Cell. Biology*, (1987) 7:2914–2924.

However, the evidence offered by defendants is not conclusive because creditable testimony bears directly on the obvious-ness issue. For example, Perlak testified that the limitation of Claim 7 not taught in prior art references concerned modifications to the 240 region. Barton and Hoekama do not discuss these modifications. Similarly, Bailey–Serres testified that Monsanto's identification of the 240 region was not obvious in light of the prior art. Additionally, the evidence of commercial success of *Bt* corn products in a relatively short period of time supports the nonobviousness of the invention. *Pro–Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d at 1571.

Based upon the evidence admitted at trial and discussed above, the court finds that it is not the only reasonable conclusion that the Claims 7, 8, 9 and 12 of the 365 patent are invalid for obviousness. Accordingly, the court denies defendants' motion for JMOL that the asserted claims of the '365 patent are invalid for obviousness.

### B. *Should the Court Grant the Parties' Motions for a New Trial?*

The parties have all moved for a new trial. Here, the court addresses these motions.

#### 1. *What is the Standard for Granting a New Jury Trial?*

■ "The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court." *Blancha v. Raymark Industries*, 972 F.2d 507, 512 (3d Cir.1992) (*citing Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980)). Federal Rule of Civil Procedure 59(a) permits the court to order a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *Fed.R.Civ.P.* 59(a). Although Rule 59(a) does not specify the grounds on which a district court can grant a new trial, Federal Rule of Civil Procedure 61 provides that the court should not order a new trial unless "substantial justice" so requires. *Fed.R.Civ.P.* 61. Federal Rule of Civil Procedure 61

also instructs the court to disregard any "error or defect in the proceeding which does not affect the substantial rights of the parties." *Id.*

■ Federal district courts recognize that (1) a prejudicial error of law; (2) a verdict against the weight of the evidence; or (3) a jury's grossly excessive or inadequate award against the weight of the evidence may be grounds for the district court's ordering a new trial. *See Maylie v. Nat'l R.R. Passenger Corp.*, 791 F.Supp. 477, 480 (E.D.Pa.1992), *aff'd*, 983 F.2d 1051 (3d Cir.1992) (*citing* 11 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2805, at 38 (1973)); *Lee v. Consol. Rail Corp.*, 1995 WL 734108, *2 (E.D.Pa. Dec.5, 1995).

The Third Circuit provides for two different standards of review for new trial motions depending on whether the motion is based on (1) a prejudicial error of law or (2) a verdict against the weight of the evidence. The third category, (3) a jury's grossly excessive or inadequate award against the weight of the evidence, is not an issue before the court, therefore, the court does not discuss it.

■ When the district court commits a prejudicial error of law, it has wide discretion in deciding a motion for a new trial. *See Klein v. Hollings*, 992 F.2d 1285, 1289–90 (3d Cir.1993); *Lee v. Consol. Rail Corp.*, 1995 WL 734108, *2. The district court has this discretion because rulings of law initially rest with the district court judge, so ordering a new trial because a ruling of law may have prejudiced the losing party does not usurp the jury's role as fact finder.

However, when the issue is whether the verdict is against the weight of the evidence, the district court judge has much narrower discretion in deciding a new trial motion. The Third Circuit teaches that granting a new trial motion "because the verdict is against the weight of the evidence [is] proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned

or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991). This limit on the district court's power to grant a new trial seeks to ensure that a district court does not substitute its own "judgment of the facts and the credibility of the witnesses for that of the jury." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir.1992), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993) (*quoting Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.1960)).

■ In considering a new trial motion, the district court must "view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict." *Marino v. Ballestas*, 749 F.2d 162, 167 (3d Cir.1984). To uphold the verdict, the district court only needs to determine that the record contains the minimum quantum of evidence from which a jury might reasonably afford relief. *See Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir.1980) (quoting *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.1969)), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). The district court does not grant a new trial motion based on harmless error. *Fed.R.Civ.P. 61.*

2. *Should the Court Grant Monsanto's Motion for a New Jury Trial on the Issue of Non-infringement Under the Reverse Doctrine of Equivalents?*

Monsanto moves in the alternative for a new trial on the issue of non-infringement under the reverse doctrine of equivalents. As the court will grant Monsanto's motion for JMOL on this same issue, this motion has become moot. Thus, the court need not address it further.

3. *Should the Court Grant Mycogen's Motion for a New Jury Trial on Various Issues, Including Literal Infringement, Lack of Enablement, Lack of Written Description, Indefiniteness and Obviousness?*

Mycogen moves for a new trial on limited issues including: literal infringement,

enablement, written description, indefiniteness and obviousness.

For the new jury trial issues, Mycogen relies largely on its post-trial briefing for its JMOL motions to argue its case. Mycogen, although moving for JMOL and a new jury trial on the enablement issue, has not presented any arguments on this issue in its post-trial briefs. The court has discussed these issues in some detail in the JMOL section above. As a result, there is little new ground to cover here.

The court finds that the record contains more than adequate evidentiary support for the jury's findings on the issues of literal infringement and invalidity for lack of enablement, lack of written description, indefiniteness and obviousness. Accordingly, the court upholds the jury's finding with respect to these issues and denies Mycogen's new jury trial motions with respect to literal infringement, written description, enablement, indefiniteness and obviousness.

C. *Have Defendants Shown by Clear and Convincing Evidence that Hoerner or Fischhoff Breached a Duty to Disclose Material Information to the PTO With the Intent to Deceive or Mislead, Resulting in Inequitable Conduct?*

Defendants have counterclaimed for a declaratory judgment that the '365 patent is unenforceable because of Monsanto's inequitable conduct before the PTO. The court held a separate bench trial on this counterclaim. Here, the court addresses whether the defendants have shown by clear and convincing evidence that Hoerner or Fischhoff breached a duty to disclose material information to the PTO with the intent to deceive or mislead, resulting in inequitable conduct.

1. *What is the applicable legal standard governing the duty to disclose material information to the PTO?*

The Federal Circuit has explained that a patent applicant's duty to disclose material information to the PTO arises under the general duty of candor, good faith, and honesty found in so-called Rule 56 in 37 C.F.R. § 1.56(a) (1996). Specifically, patent applicants and their patent attorneys have a duty to disclose to the PTO information of which they are aware which is material to the examination of the application. *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 30 (Fed.Cir. 1999); *see also Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed.Cir.1997).

■ Inequitable conduct arising from failure to satisfy the duty to disclose requires clear and convincing proof of: (1) information that is material; (2) knowledge chargeable to the patent applicant of such information and its materiality; and (3) the applicant's failure to disclose such information resulting from an intent to mislead the PTO. *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed. Cir.1987); *see also Key Pharmaceuticals v. Hercon Labs. Corp.*, 161 F.3d 709, 719 (Fed.Cir.1998); *Critikon, Inc.*, 120 F.3d at 1256.

■ Once materiality and intent have been established, "the court conducts a balancing test and determines whether the scales tilt to a conclusion that 'inequitable conduct' occurred." *Critikon, Inc.*, 120 F.3d at 1256. In balancing materiality and intent, the more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and *vice versa. Id.*

a. *What is the definition of materiality?*

■ Prior to 1992, materiality was defined as whether "there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *See, e.g., Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1179, n. 8 (Fed.Cir.1995) (citing the then current PTO regulation). In 1992, however, the PTO amended the regulation gov-

erning materiality "to address criticism concerning a perceived lack of certainty in the materiality standard." 57 *Federal Register* 2023 (Jan. 17, 1992); *Manual of Patent Examining Procedure* § 2001.04 (1996). While the *Manual of Patent Examining Procedure*, ("MPEP") does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith. *See Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439 (Fed.Cir.1984), *implied overruling recognized on other grounds, Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815 (Fed.Cir.1992).

Rule 56(b), as amended, provides in relevant part, that information is material to patentability when:

(1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (1996); *see also Manual of Patent Examining Procedure* § 2001.05.

Rule 56(b) further provides that:

[a] *prima facie* case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56(b) (1996).

■■■ An applicant has no duty to submit information which is not material to the patentability of any existing claim. *Id.* Moreover, the PTO has explained that

"[w]hile information may be material under the definition, there is no duty on an individual to disclose the information if the information is unknown to the individual." 57 *Federal Register* 2026 (Jan. 17, 1992). The PTO has also noted that "there can be no duty to disclose the information if it is material only in combination with unknown information." *Id. See also Manual of Patent Examining Procedure* § 2001.05.

b. *Does a patent applicant have a duty to disclose information about a later-filed, non-commonly owned patent application under Rule 56?*

Monsanto argues that the Barton and Miller application is not material information because Agracetus owned the Barton and Miller application until April 1996, and filed it with the PTO after Monsanto had already filed its '355 application. This makes the Barton and Miller application a later-filed, non-commonly owned patent application. According to Monsanto's interpretation of Rule 56, it has no legal duty to disclose a later-filed, non-commonly owned patent application to the PTO. Here, the court addresses these legal arguments. First, the court examines if a patent applicant has a duty to disclose a later-filed application and then examines if a patent applicant has a duty to disclose a non-commonly owned patent application.

i. *Is there a duty to disclose a later-filed application under Rule 56?*

■■■ Monsanto argues Rule 56 applies to information that is material to patentability, or whether an invention is patentable. Monsanto argues this is a separate issue from prior art, or who has priority to an invention. Monsanto argues that at best, disclosure of the Barton and Miller application might have caused the PTO to declare an interference. According to Monsanto, the mere possibility of an interference does not raise a *prima facie* case of unpatentability under Rule 56(b). Monsanto argues that before a patent claim can be placed in an interference, the claim

must be determined to be patentable. Accordingly, Monsanto argues that the Barton and Miller application, as a later-filed application, could not serve as the basis for a "patentability" determination by the PTO as required by Rule 56.

The Federal Circuit has not yet offered extensive insight into current Rule 56. *See, e.g., Molins PLC,* 48 F.3d at 1179 ("We thus make no comment regarding the meaning of new Rule 56.") Nor has the Federal Circuit declared itself limited by the PTO's definition of material information. In fact, the court, in examining old Rule 56, regarded it as "an appropriate starting point in determining materiality." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1363 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

In examining these issues concerning the legal standard of materiality, the court stresses that the PTO's Rule 56 should be interpreted consistently with the Federal Circuit's holdings. *See* 35 U.S.C. § 6. (In delegation of authority to PTO, Congress provided that Commissioner "may ... establish regulations, not inconsistent with law, for the conduct of proceedings in the Patent and Trademark Office.").

Priority of invention is a condition of patentability under the patent law. 35 U.S.C. § 102(g) ("A person shall be entitled to a patent unless ... before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it."). In applying old Rule 56, the Federal Circuit regarded information as material when it related to a decision whether to allow the application to issue as a patent. *Refac Int'l, Ltd. v. Lotus Dev. Corp.,* 81 F.3d 1576, 1581 (Fed.Cir.1996) (citations omitted). Similarly, the PTO defines information "material to patentability," as used in the current Rule 56, to include information on "prior invention by another." *Manual of Patent Examining Procedure* § 2001.04. Based on these premises, the court determines that mate-

rial information can include a patent application filed after a different patent application. Therefore, the court concludes that a patent applicant has a duty to disclose a later-filed patent application to the PTO.

ii. *Is there a duty to disclose a later-filed, non-commonly owned patent application under Rule 56?*

■ The PTO provides the following guidance: "individuals covered by 37 C.F.R. § 1.56 have a duty to bring to the attention of the examiner ... information within their knowledge as to other copending United States applications which are 'material to patentability' of the application in question." *Manual of Patent Examining Procedure* § 2001.06(b).

Monsanto argues that "copending" as used above means only commonly owned patent applications. According to Monsanto, it did not own the Barton and Miller application during the pendency of the '365 patent application. Therefore, it had no legal duty to disclose it during this pendency.

The court finds that there is nothing in the plain meaning of " 'copending' U.S. applications" as used in § 2001.06(b) that restricts this phrase to mean only commonly owned patent applications. Rather, the court understands the phrase to refer to patent applications, regardless of ownership, submitted to the PTO but not yet decided. In other words, the phrase refers to patent applications that are before the PTO at the same time.

Moreover, this understanding comports with the Federal Circuit's use of this phrase. The Federal Circuit and other courts have long used "copending" in the patent context to refer to non-commonly owned applications. *See, e.g., Bruning v. Hirose,* 161 F.3d 681 (Fed.Cir.1998); *Bierly v. Happoldt,* 40 C.C.P.A. 774, 201 F.2d 955, 957 (1953).

For these reasons, the court finds that Monsanto's definition of "copending" is unduly restrictive by adding a requirement that is not in the plain meaning. The

court determines that "copending" refers to commonly owned and non-commonly owned applications. Accordingly, the court finds that under Rule 56, a patent applicant has a duty to disclose a later-filed, non-commonly owned patent application.

2. *Did Hoerner or Fischhoff breach a duty to disclose material information about the Barton and Miller application with the intent to deceive or mislead the PTO, resulting in inequitable conduct?*

 Having determined that a patent applicant has a duty to disclose a later-filed, non-commonly owned patent application under Rule 56, the court must now address whether Hoerner or Fischhoff failed to disclose material information concerning the Barton and Miller application with the intent to deceive or mislead the PTO. To do this, the court must examine: (1) what information Fischhoff and Hoerner actually had; (2) whether Fischhoff or Hoerner understood or appreciated that the information they had was material to patentability; and (3) whether Fischhoff or Hoerner had the intent to deceive or mislead the PTO by not disclosing the material information. *See, e.g., Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988).

In determining intent, the court views the involved conduct, in light of all the evidence, including evidence indicative of good faith. To show intent, "clear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, *viz.*, misleading or deceiving the PTO." *Molins PLC*, 48 F.3d at 1181.

The record shows and the parties do not dispute that Monsanto had in its possession three different pieces of information related to the Barton and Miller patent application. These include: (1) a copy of the abstract of the Barton and Miller patent application; (2) the Parker report; and (3) the fact that the Barton and Miller patent application had an August 1989 U.S. priority date. The court will now address each source of information separately to determine: (1) what information Fischhoff and Hoerner actually had; (2) whether Fischhoff or Hoerner understood or appreciated that the information they had was material to patentability; and (3) whether Fischhoff or Hoerner had the intent to deceive or mislead the PTO by not disclosing the material information.

a. *The abstract of the Barton and Miller patent application*

The court finds that the abstract of the Barton and Miller patent application contains a general description of the Barton and Miller invention and refers to the use of plant preferred codons in the altered coding sequences.

The record shows that Hebblethwaite received a copy of it, at his request, in February 1991. The defendants have not argued that Hebblethwaite is one with skill in the art. Nor have defendants argued that he breached a duty to disclose.

The defendants have not argued that Hoerner read the abstract. Nor have defendants presented any evidence that he read it. While defendants assert that Fischhoff read the abstract prior to 1996, he testified to the contrary and defendants have not been able to contradict his testimony.

Thus, even if the court assumes that the abstract is material information, the court finds that the defendants have not shown by clear and convincing evidence that Fischhoff or Hoerner had knowledge of the abstract. Fischhoff and Hoerner do not have a duty to disclose information if the information is not known to them. *See FMC Corp.*, 835 F.2d at 1415.

b. *The Parker report*

Defendants do not assert that Parker, as an agent of Monsanto, had a duty to disclose the existence of the Barton and Miller application to the PTO on his own

initiative. Accordingly, the court will not address that issue.

The record shows that Parker completed his report on March 25, 1992 and delivered it to Hoerner shortly thereafter. Hoerner presumably read the Parker report and thus had knowledge of the information it contained. No evidence suggests that Fischhoff ever saw or read the report. Thus, defendants have not proven that he had any knowledge of the Parker report.

Hoerner had access to Parker report, and presuming it contained material information, the question becomes whether Hoerner appreciated it as such. Hoerner testified that none of the information he had concerning the Barton and Miller application was enough to make him think that the Barton and Miller application "had any connection to what was claimed in the '365 patent." He testified that he received no indication that any disclosure in the Barton and Miller application dealt with a modified 240 region as claimed in the '365 patent. No clear and convincing evidence shows that based on the underlying facts disclosed in the Parker report, Hoerner should have realized that the Barton and Miller application contained interfering subject matter to the '365 patent. Because he did not appreciate the facts disclosed in the Parker report as material information, Hoerner's failure to disclose the information did not result from any intent to mislead the PTO. *See, e.g., Elk Corp. of Dallas.*, 168 F.3d at 30 (citations omitted); *Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1543 (Fed.Cir.1997) (upholding district court's finding of lack of inequitable conduct because no evidence that inventor personally saw reference or had actual knowledge of it).

Accordingly, the court finds that defendants have not established that Hoerner or Fischhoff had a duty to disclose the Barton and Miller application, based upon the underlying facts disclosed to them in the Parker report.

c. *Information concerning the August 1989 U.S. priority date for the Barton and Miller application*

Here, the court examines whether the fact that Monsanto knew the Barton and Miller application had an August 1989 U.S. priority date is evidence that Hoerner or Fischhoff knew it contained material information.

In this context, the record shows that Monsanto's knowledge of the August 1989 U.S. priority date refers to the date, August 7, 1989, when Agracetus first filed the Barton and Miller application with the PTO. The record also shows that Hoerner and Fischhoff both knew about this August 1989 priority date. Hebblethwaite testified that Hoerner provided the August 1989 priority date information to him. He also testified that in December 1991, Hebblethwaite shared it with others, including Fischhoff. This testimony is supported by Hebblethwaite's December 6, 1991 presentation paper. The record does not show how Hoerner got his information about the priority date.

Having established that both Hoerner and Fischhoff knew that the Barton and Miller patent application had an August 1989 U.S. priority date, the court next has to determine whether this information about the Barton and Miller application is material. It bears repeating that material information is information that is material to patentability. 37 C.F.R. § 1.56(b). Information concerning the U.S. priority date for the Barton and Miller application is not information that is material to patentability because it discloses nothing about the invention Barton and Miller claimed. There is no clear and convincing evidence that Hoerner or Fischhoff knew that the Barton and Miller application disclosed modifications to the 240 region like the '365 patent application. Nor is there any clear and convincing evidence that they knew that the Barton and Miller application claimed the same patentable invention as the '365 patent application or had overlapping claims with it. Thus, the

court determines that the fact that Hoerner and Fischhoff had knowledge of the August 1989 priority date does not prove that they had material information. Accordingly, the court finds that defendants have not shown by clear and convincing evidence that either Hoerner or Fischhoff breached a duty to disclose based on their knowledge of the August 1989 priority date for the Barton and Miller application.

### 3. What is the court's conclusion regarding inequitable conduct?

Based upon the evidence discussed above, the court finds that defendants have not shown by clear and convincing evidence that Hoerner or Fischhoff breached any legal duty to disclose material information to the PTO. Accordingly, the court will enter judgment for Monsanto on Mycogen's and Novartis's counterclaim for declaratory judgment that the '365 patent is unenforceable due to inequitable conduct before the PTO.

## III. CONCLUSION

For the reasons set forth above, the court grants Monsanto's motion for judgment as a matter of law on the issue of non-infringement of Claims 7, 8, 9 and 12 under the reverse doctrine of equivalents. The court denies Monsanto's motion for judgment as a matter of law on the issue of invalidity by prior invention. The court also denies Monsanto's motion for a new trial on the issue of non-infringement under the reverse doctrine of equivalents.

The court denies Novartis's motions for judgment as a matter of law on the issues of: (1) invalidity for lack of an adequate written description; (2) invalidity for indefiniteness and (3) invalidity for obviousness.

The court denies Mycogen's motion for judgment as a matter of law on the issues of: (1) invalidity for lack of an adequate written description and (2) invalidity for indefiniteness. The court denies Myco-

gen's motion for a new jury trial with respect to these issues.

The court finds defendants have not shown by clear and convincing evidence that Monsanto engaged in inequitable conduct.

The court will enter an Order in accordance with this Opinion.